Filed 10/30/14

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
      Plaintiff and Respondent, )
)      S118045
      v. )
)
MARCUS DORWIN ADAMS, )
)      Los Angeles County
      Defendant and Appellant. )   Super. Ct. No. BA181702
_____)

      A jury convicted defendant Marcus Dorwin Adams of the 1994 first degree murders of Dayland Hicks, Lamar Armstrong, and Trevon Boyd (Pen. Code, § 187),[1] the attempted murder of Luis Hernandez (§§ 187, subd. (a), 664), and carjacking. (§ 215, subd. (a).) The jury found true the allegation that defendant discharged a firearm at an occupied motor vehicle causing great bodily injury and death within the meaning of section 12022, subdivision (b)(1), with respect to the three murder counts. The jury also found true the alleged multiple-murder special circumstance. (§ 190.2, subd. (a)(3).) With respect to the attempted murder, the jury found true the allegation that defendant personally inflicted great bodily injury upon the victim within the meaning of section 12022.7, subdivision (a). The jury returned a verdict of death for the three first degree murders.

_____

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

1

The trial court denied defendant's motion to reduce the penalty and his motion for a new penalty phase trial and sentenced defendant to death. The court also imposed, but stayed, a determinate sentence of nine years in prison for defendant's attempted murder conviction and an indeterminate term of life with the possibility of parole for his conviction of carjacking. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## I. FACTS

### A. Guilt phase evidence

In early September 1994, defendant, a member of the Six Deuce Brim Bloods gang, walked up to the car in which three members of the Rollin' 60s Crips gang were sitting. He shot and killed all three men at close range. Not quite a month later, defendant shot a security guard patrolling the parking lot of a credit union. He fled the scene with his two companions. In a nearby neighborhood, they carjacked a woman's car.

At trial, regarding the first three shootings, defendant challenged the credibility of the witnesses who identified him as the shooter. Regarding the later incidents, defendant claimed one of his companions was the shooter and had pulled the woman out of her car.

### 1. The September 7, 1994 homicides

On the afternoon of September 7, 1994, Lewis Dyer was standing with Zenia Meeks, a drug addict, on Western Avenue at 47th Street in Los Angeles, across the street from Ford's Liquor store. The area was known as a Crips gang neighborhood and Dyer was a member of the 46th Street Neighborhood Crips gang. Dyer and Meeks saw Dayland Hicks, Lamar Armstrong, and Trevon Boyd, members of the Rollin' 60s Crips gang, drive up in a Cadillac and park in front of the liquor store. The two Crips gangs were friendly. Dyer and Meeks walked

2

over to the Cadillac, and Dyer began to speak with Hicks. Dyer and Hicks went into the liquor store. After Hicks bought a beer, they returned to the Cadillac. Hicks got into the driver's seat. Boyd was sitting in the front passenger seat, and Armstrong was sitting in the backseat. Dyer leaned on the passenger side of the car and continued to speak with the three men. According to Meeks, she stood near the hood of the car, waiting for the men to finish their conversation.

Dyer and Meeks both noticed a young man walking toward them. Dyer recognized the man as defendant, whom he knew to be a Bloods gang member with the gang moniker of "Little Sonny." Dyer and defendant knew each other when they were both held in the same California Youth Authority (CYA) juvenile facility. Although defendant belonged to a Bloods gang, he was not wearing colors associated with the Bloods gangs, but colors that blended into the Crips neighborhood. During this time in 1994 a gang war was underway between the Bloods and the Crips. The 46th Street Neighborhood Crips gang, along with the Rollin' 60s Crips gang, were enemies of the Six Deuce Brim Bloods gang — defendant's gang. Defendant pulled out a gun and shot at Dyer. Dyer ducked, crawled to the front of the car, then stood up and ran down the street while defendant fired a number of shots into the Cadillac at close range. Meeks stood still.

Hicks suffered a fatal gunshot wound to his head at the right temple area and a nonfatal gunshot wound to his upper right arm. The wounds were consistent with Hicks having raised his arm up in a defensive position at the side of his head. Boyd suffered gunshot wounds to his chest, the ring finger of his left hand, and his right forearm. One of the bullets that entered his chest fatally damaged his liver and heart. Armstrong was also shot in the arm and chest. The bullet that entered his chest fatally damaged his liver, heart, and left lung. When defendant finished

3

shooting, he walked back toward an alley, got into a red four-door car, and drove down 47th Street.

Hicks died in the Cadillac. Boyd exited the Cadillac and ran into Ford's Liquor store. Meeks followed Boyd into the store and saw that he had been shot. She ran back across the street to a pay phone, dialed 911, and reported the shootings. Lisa Mallard, who was in the liquor store with the owner, an employee, and another individual, tried to calm Boyd. Mallard told him that the paramedics were coming, but Boyd passed out and died. Armstrong exited the Cadillac, but collapsed near the corner of 47th and Western. Armstrong and Boyd were transported to area hospitals. Armstrong died at the hospital.

When Dyer returned to the scene, he saw Hicks's body still in the driver's seat, with blood everywhere. He saw the police and paramedics arrive, but he did not talk to them. Dyer felt that he should not say anything because a gang member would be labeled a "snitch" if he spoke to the police about a gang-related crime, even if the crime was committed by a rival gang against the member's own gang. Dyer feared that if he told the police what he knew about the shooting, others would try to harm him. He did not want to get involved. Instead, Dyer went to a nearby pay phone and called Hicks's uncle, Gregory Shoaf. He told Shoaf that Hicks had been shot and that defendant was the shooter.

On the day of the homicides, police officers took Meeks to the police station for an interview. Meeks did not give Dyer's name to the police because she wanted to protect him. And although Meeks had recognized defendant as the shooter, she did not identify him to the police because she was frightened and did not want to get involved. Instead, she told the police that she was unable to identify the shooter, claiming she was high and on psychiatric medication. Police spoke with Meeks several times and showed her a set of photographs of possible suspects. Meeks did not identify anyone because of concerns about her own and

4

her family's safety. At trial, she explained that a member of her family had received a telephone call that Meeks understood as a warning to keep quiet.

A week after the shootings, the police contacted Dyer, but he gave them no information. He claimed that he was inside the liquor store when the shots were fired. The next day, after receiving information from Shoaf that Dyer was a witness to the shooting, the police asked Dyer to come into the police station. When Dyer arrived, Shoaf, Shoaf's sister, and Boyd's mother were there. Dyer was initially reluctant to talk to the police, but changed his mind after the family members convinced him he should tell the police what he knew about the killing of his friends. Dyer told the police what happened and gave a written statement. He identified defendant as the shooter in a photographic lineup.

Defendant was taken into custody early in October 1994 and interviewed as a suspect regarding various gang murders. Defendant told the interviewing detectives that he knew about the killings on Western Avenue. He said the shooter put on a blue shirt to make the victims think he was a Crips gang member. He walked up to their car and "dumped on them," using a .9-millimeter handgun and fled in a red car. Defendant, however, denied being present, denied committing the shootings, and refused to disclose the name of the perpetrator. He stated that the shooter knew the Crips gang member who witnessed the shooting because they had been in jail together, but defendant denied knowing the witness himself. Defendant told the detectives that his family fell apart after Rollin' 60s gang members killed his brother. He blamed the 60s for what happened to his family. Defendant told the detectives that he was not admitting the murders, but if he had done them, the reason would be the killing of his brother.

Dyer was subsequently arrested on a parole violation and taken to county jail. Defendant was in the same jail at that time. When Dyer was asked to view a live lineup that included defendant, Dyer did not identify defendant as the shooter

5

because he was afraid of what could happen to him in jail if he was labeled a snitch. Sometime later, Dyer was brought to an office where defendant was waiting. Defendant told Dyer not to say anything and showed him a copy of the statement Dyer had made to police identifying defendant as the shooter. Defendant told Dyer that the sheriff's deputy who escorted him to the office was defendant's cousin and that defendant could have Dyer moved to a safe facility as long as Dyer did not identify him. Defendant told Dyer that he had given him "a pass," meaning he could have killed him when he shot the others but chose not to. Dyer assured defendant that he had not picked him out of the lineup and that he did not intend to "tell on [him]." At trial, Dyer testified that he had decided not to testify or cooperate with the police even before this conversation. Dyer testified that he was concerned that if his statement to police "[got] around the jail" he could be hurt or killed. He said that he received threats before and after the lineup.

When a defense investigator subsequently came to interview him at the CYA facility where Dyer was transferred, Dyer lied and said that he had been in the liquor store at the time of the shootings. He told the investigator that he did not see anything and claimed the victims' families pressured him into making his statement to the police. Meeks continued to be uncooperative with the police. In 1995, the case against defendant was dismissed and he was released.

In 1998, investigators from the Santa Barbara County District Attorney's Office contacted Dyer, who had been released from custody a couple of years earlier. The investigators asked about the 1994 murders. Because Dyer was trying to reform his life, he decided to cooperate with them and to testify against defendant. He told the investigators about being threatened and about his jailhouse conversation with defendant. When Dyer was contacted by Los Angeles police detectives and asked to attend a live lineup in 1999, Dyer identified

6

defendant as the shooter of his three friends. Dyer also identified defendant as the shooter at defendant's preliminary hearing and again at trial.

Kipchoge Johnson testified at defendant's trial that until 2000 he belonged to the Van Ness Gangsters, a Brim Bloods gang that was "best friends" with defendant's gang, the Six Deuce Brim gang. Johnson testified that he decided to tell the police what he knew about this shooting because he had become "disgusted" with the gang lifestyle and had become friends with the brother of one of the three victims.

Johnson recalled being with defendant in 1994 when defendant received an upsetting phone call. Defendant told Johnson that one of defendant's "homies" had just been killed by a Crips gang member. A few days later defendant came in with a newspaper article. He said, "This is what I did for the homies" and threw the newspaper on the floor. Everybody ran to look at it. Johnson saw that it was an article about the killings of the three Rollin' 60s gang members. Some of the older gang members who were present asked defendant what had happened. Defendant replied that he "ran up on them" and with five shots "domed," meaning shot in the head, all three of the men who were inside a parked Cadillac. He had made sure they were Crips gang members by "throwing" their neighborhood sign at them and having them throw the sign back to him. Johnson testified that using only five shots and shooting a person in the head would garner more status for a gang member. He also testified that a gang member would not take credit for a killing that he did not commit because if he did, he would be disciplined and kicked out of the neighborhood. According to Johnson, if defendant bragged about killing someone, he must have done it. Johnson believed it fair to say that defendant hated the Rollin' 60s gang.

A few months after the killings, Johnson met defendant on the county jail bus while going to court. Johnson asked defendant who had identified him as the

7

shooter and defendant replied it was the person to whom he had given a "pass" and allowed to run away based on their prior custody together in CYA. Defendant said that he should have killed him too. Johnson subsequently heard defendant tell some Crips gang members that he was going to "beat this," get out of jail, and kill some more of their members.

Christopher Fennelle was a member of the Six Deuce Brim Bloods gang until 1995. He knew defendant for a number of years as a member of the same gang. Fennelle testified that sometime in 1995 defendant came to Fennelle's home because he wanted to buy a gun. As they were talking, defendant brought up the subject of the three Rollin' 60s Crips who were killed the previous year. Defendant told Fennelle that he had seen the Cadillac parked with three Crips inside and one standing outside. As defendant walked up to the car, the man by the passenger door saw him and took off running. Defendant said he fired shots at the fleeing man and then shot everyone in the car.

Special precautions were taken to protect both Johnson and Fennelle while they were testifying during the trial. And they were both promised that whenever they were released from prison they would be provided with witness relocation services.

In 2001, Meeks was in a drug rehabilitation program and had become a Christian. She decided to cooperate with authorities regarding the 1994 shooting. She subsequently identified defendant in a photo lineup as the shooter.

*2. The October 3, 1994 attempted murder and carjacking*

On October 3, 1994, Luis Hernandez was working as a security guard patrolling a parking lot for several Santa Monica businesses, including the Telephone Employees Credit Union. About 10:30 a.m., a car approached Hernandez. There were three African-American men in the car. The front

8

passenger asked Hernandez if he knew the location of Santa Monica College. As Hernandez pointed to the left, the man said, "Don't move," reached into the glove compartment of the car, and pulled out a handgun. Hernandez turned and ran toward the entrance to the credit union. He heard several shots behind him. He was hit and fell down, but got up again and continued running. He was shot again as he reached the credit union door and collapsed after he entered the building. He was taken to the hospital where he had surgery and remained for a week. He was out of work for two months.

Jasmine Green was inside the credit union that morning, and looked up when she heard gunshots. She observed a yellow Cadillac parked outside and as she watched, a man stepped from the passenger side of the car and shot at Hernandez, the security guard. Hernandez ran past the window and into the credit union, collapsing in front of her. Green then saw the shooter get back in the car and the car drive away. She got a good look at the shooter. She believed he used a .9-millimeter gun, and described all three men in the car as African-American.

About 11:15 a.m. on the same day, Socorro Navarro drove to the Santa Monica home of her friend, Linda Nicastro, to give her a ride to work. Navarro stopped in front of her friend's home on Oak Street, which is about six blocks away from the Telephone Employees Credit Union. Navarro honked her horn and Nicastro came out of the house. Before Nicastro could get to Navarro's car, a yellow car with two African-American men in the front seat suddenly came from the opposite direction and stopped next to Navarro. The driver got out and approached Navarro. He produced a gun and said, "Bitch, get out of the car." Frightened, Navarro complied. She walked over to Nicastro. They grabbed hands and walked toward the apartment building without looking back toward the car. Navarro heard the sound of cars speeding away. She turned and saw her car and the yellow car drive away in the same direction.

9

Jerry Flannery lived across the street from Nicastro. Around 11:15 a.m. that morning, he had just parked his car and was walking across the street when he heard another car approaching at a high rate of speed. He heard it slam on its brakes and saw it pull up next to Navarro's car. He saw three people inside the car. Flannery testified that the driver, an African-American male in his late 20s, got out and walked up to Navarro, yelling at her to get out of her car. Flannery started toward Navarro to help her, but the man raised a gun, which Flannery recognized as a .9-millimeter semiautomatic. When the man pointed it at Flannery, Flannery dove behind the parked cars, then crawled to the front of one of the cars and peeked around the corner. Flannery saw the man yank Navarro's car door open, grab Navarro by the hair, and drag her out of the car. Flannery turned and went to nearby apartment buildings, knocking on three or four doors in an attempt to get someone to call the police. Flannery returned to the street in time to see the two cars drive away. Flannery got back into his car and tried to follow them in order to obtain a license plate number, but was unable to find the cars.

In 1999, Santa Monica Police Sergeant Gary Steiner was assigned to reinvestigate the 1994 credit union shooting and subsequent carjacking. He interviewed defendant after he heard that defendant had information regarding the case. Defendant told Steiner that he wanted to get his former friend Chauncey Bowen, who was the brother of Fennelle, in trouble because Bowen had tried to kill defendant and defendant's girlfriend. Defendant described the shooting of Hernandez at the credit union and the subsequent carjacking of Navarro, but claimed that he had acted only as a lookout and that Bowen was both the shooter at the credit union and the man who dragged Navarro out of her car. Defendant told Steiner that he later bought the gun that Bowen had used and it was that gun he had with him when he was arrested back in October 1994.

10

Forensic examination in 1995 of the shell casings and bullet fragments recovered in connection with the shooting of Hernandez determined that the shell casings were fired from one gun and that the bullets were also fired from one gun. But without the benefit of analyzing the gun itself, it could not be determined that the casings and bullets were fired from the same gun. After defendant's interview statements in 1999, the shell casings and bullet fragments were reanalyzed, along with the gun seized when defendant was arrested in 1994. It was then determined that the shell casings and bullet fragments had been fired from that gun. That gun was not the weapon used in the 1994 killings of Hicks, Boyd, and Armstrong.

In 1999, credit union customer Green was shown a photographic lineup of possible suspects in the credit union shooting. She identified defendant's picture as being that of the shooter. She also identified defendant as the shooter in a subsequent live lineup and later at trial.

**B. Penalty phase evidence**

*1. Evidence submitted in aggravation under factor (b) of section 190.3*

In the penalty phase, the prosecution presented evidence of defendant's history of numerous criminal activities involving the use or attempted use of force, violence or threat. (§ 190.3, factor (b).)

*a. Carjackings committed as a juvenile*

The prosecution presented evidence of two carjackings committed by defendant when he was 17 years old.

According to Alice Rox, on January 21, 1988, she parked her car on her way to a swap meet in Los Angeles. When she got out of her car, a male, whom she later identified as defendant, pointed a gun at her and demanded the keys to her car. She tossed the keys to him, and defendant took her car. The car was recovered a few days later.

Dwain Edwards testified that on February 4, 1988, he drove his car to a gas station. Edwards was about to fill his car when a male, whom Edwards later identified as defendant, pointed a machine gun at him and demanded his keys. Edwards complied and ran approximately 50 feet away. When he turned around, he saw defendant leaving in his car. Defendant was taken into custody later that day on the campus of a local high school, and police seized a machine gun that a witness claimed to have seen defendant hide. The weapon held a 50-round clip, which contained 40 rounds when it was examined. Defendant admitted committing both the January 21 and February 4 carjackings. Edwards's car was recovered several days later.

### b. *September 1994 robbery of Pacific Marine Credit Union*

On the morning of September 27, 1994 — three weeks after the triple homicide of Hicks, Boyd, and Armstrong and six days before the attempted murder of Hernandez and the carjacking of Navarro — Melissa Lopez was working as the head teller and assistant manager at the Pacific Marine Credit Union in Oceanside. Lopez testified that at approximately 11:30 a.m., the glass double doors of the credit union flew open and three or four African-American men ran inside. They were carrying semiautomatic weapons, which they pointed at the tellers. Two of the men hurdled the first two teller counters and ordered everyone to the ground. Lopez was ordered to get up when she identified herself as the person who was in charge of the credit union that morning. One man, later determined to be defendant, led her to the vault at gunpoint and demanded she open it. Lopez fumbled with the keys. Defendant put his gun next to her temple and said he would shoot her if she did not hurry. After she opened the vault, defendant took the currency and placed it in a bag. Lopez could hear another man on the other side of the credit union ordering tellers to open their drawers. The

12

men left the credit union, and someone called 911. After the robbery, the credit union manager performed an audit and determined that $161,589.23 had been taken. Lopez identified defendant at trial as the man who had forced her back to the vault, held a gun at her head, and took the currency.

Michael Loughran worked for a company whose office was inside the credit union. He testified that he heard the commotion in the credit union that morning. He looked around his door and saw an African-American man, whom Loughran identified in court as defendant, pointing a gun at him. Defendant told Loughran to come into the bank and lie down by the tellers. Loughran complied, and heard sounds from the vault area. Then defendant, holding a big bag, jumped over the counter and landed next to Loughran. Defendant put his knee on Loughran's chest and asked if he had any money. Loughran reached into his top pocket, where he usually kept his cash, but pulled out his business cards by mistake. Defendant hit Loughran in the head with his gun and said, "Give me all your money, white boy." He pointed the gun at Loughran's face. Loughran remembered his money was in a different pocket. He handed defendant two $100 bills. Defendant took Loughran's pager, stood up, and walked out of the credit union. Loughran identified defendant at trial as the man who pointed the gun at him and took his money and pager.

According to Bloods gang member Kipchoge Johnson, defendant bragged about the robbery of the credit union. Johnson explained that defendant did not have a job; defendant's job was being a gangster. Johnson said that defendant would rob banks and kill people, go to prison, get out and do the same thing over again.

Santa Monica Detective Steiner interviewed defendant in 1999. According to Steiner, defendant said that he and Chauncey Bowen had robbed the credit

13

union in Oceanside in September 1994. According to defendant, they stole almost $200,000. Defendant described his role in the robbery to Steiner.

Melissa Lopez testified regarding the impact the robbery had on her life. According to Lopez, she had worked at the Pacific Marine Credit Union for three and a half years at the time of the robbery. She loved working there and felt she had a strong future. After the robbery, she immediately started looking for a different job. She completely changed her field of work. She required six months of posttraumatic stress syndrome therapy, seeing a therapist twice a week. She suffered nightmares for a long time after the robbery. At the time of trial in 2003, she was still frightened of doors opening quickly and of people who looked "suspicious." She did not trust people and avoided public areas after dark. Defendant's face was forever ingrained in her head and she "freaked out" whenever she saw someone who resembled defendant.

### c. October 1995 shooting of George Minor

One night in October 1995 — two weeks after defendant had been released from custody — George Minor, a drug dealer and gang member, was standing in the front yard of his home speaking with some neighbors. According to Minor, defendant and two other African-American men approached him. One of the men asked for an individual named "Ray Ray." Minor said Ray Ray was not there. Defendant, who was holding a gun, then moved the two other men aside and stepped up to Minor, saying, "You Ray Ray." Defendant announced he was "East Coast," a rival gang, and he and one of the other men began shooting at Minor. Minor was hit in the arm and the leg before he ran behind a car parked in the driveway. Both shooters fired multiple additional shots at the car and the house. When the gunfire ceased, the men scattered.

Minor testified that he ran into his house, and someone called 911. Although a number of bullets went through the walls of the house, Minor's sisters and nieces who were inside were not injured. Minor was taken to the hospital, where he stayed for several weeks. At the hospital, Minor selected defendant's picture from a photographic lineup as one of the shooters. He also identified defendant at trial as the man who called him Ray Ray and shot him. He had no doubt about his identification.

Minor's wife, Saudia, testified that she was coming home from the store when she saw the men shooting at her husband. Defendant was one of the shooters. When she saw everyone scatter, she got out of the car and went into the house, where she was told Minor had been shot. Paramedics arrived and Minor was taken to the hospital.

Los Angeles County Deputy Sheriff Angel Jaimes was patrolling with his partner on the night of the shooting. Upon hearing approximately 10 gunshots, Jaimes testified that he drove toward the sound of the gunfire and was flagged down by a man who was standing in the middle of the street. The man said he had seen the shooters and that they were headed west. Jaimes allowed him to get into the rear seat of the patrol car and they drove west. When they spotted a white Cadillac with two African-American males inside, the man got excited and pointed, saying, "That's him, that's him." Jaimes and his partner requested assistance and conducted a traffic stop of the Cadillac. Defendant and another man exited the Cadillac. Jaimes searched the car and found two hidden handguns, a .9-millimeter automatic and a .380-caliber automatic. Both men were taken into custody. During booking, Jaimes tested defendant's hands for gunshot residue. Subsequent analysis determined that gunshot residue was present on both of his hands. A criminalist testified that analysis of the bullet casings and an expended

bullet recovered from the scene of the shooting determined that they were fired from the two guns recovered from the Cadillac.

Minor testified that after he was subpoenaed as a witness regarding the shooting, he received a phone call telling him not to come to court. Saudia testified that she received multiple strange phone calls after she was subpoenaed as a witness. According to Saudia, the calls to her were from a woman and a man. On one occasion, she was asked by the caller to attend a court hearing and lie about what she saw. On another occasion, a man said he knew where Saudia's daughter went to school and that Saudia worked at International House of Pancakes. Saudia testified that she was frightened. Both Minor and his wife testified that they believed the calls were "three-way" calls from the county jail. According to Saudia, she responded to the subpoena and went to court, but when she saw defendant behind a window, she left because she was worried about her family's safety. At defendant's capital trial, however, Saudia identified defendant as one of the shooters.

### d. August 1997 robbery of Vandenberg Federal Credit Union and killing of Christine Orciuch

Defendant was released on parole on July 15, 1997.

On the morning of August 8, 1997, Jasper Altheide was working as a teller at the Vandenberg Federal Credit Union in Lompoc. He testified that four men, including Chauncey Bowen and defendant, entered the credit union. Bowen walked over to the counter and pretended to fill out a deposit slip or envelope. Defendant then ran up to the counter with a shotgun. Defendant began screaming, "Get the fuck down or I'll shoot you." He jumped over the counter and asked for the manager. When no one responded, defendant said he would shoot someone. Another credit union employee, Moira Philley, testified that she told defendant that the manager was in the back. Defendant told Philley to get up and kicked her

16

hard in the foot. When she rose, defendant put the shotgun against her back and shoved her. Philley led defendant toward the back where the manager was. According to Philley, as she and defendant were walking through a doorway, two gunshots were fired. The gunshots came from the other side of the counter near the front door and were not fired by defendant. Defendant screamed, "What the fuck?" Someone said, "let's get out of here," and defendant and the other robbers left the credit union. Philley raced to call 911 and report the robbery. An audit later determined that the robbers had taken a little over $11,000 from the teller drawers.

Octavio Gallardo was approaching the front door of the credit union while the robbery was in progress. He had a broken left leg and was walking on crutches. Gallardo testified that a woman, later determined to be Christine Orciuch, asked if he needed help and opened the door for him. After he entered, a man wearing a mask pointed a handgun at him and told him to get down. According to Gallardo, the man shot him in the right thigh before he could comply. Gallardo fell to the ground. The woman, who was behind Gallardo, turned and ran out. The man with the gun yelled at her to stop and come back. Gallardo then heard another gunshot. Orciuch was fatally shot and immediately fell to the sidewalk. Someone said, "Let's go," and Gallardo heard the sound of running toward the parking lot. One of the robbers stopped to take a backpack from Orciuch before running away.

Orciuch's 11-year-old son, Quentin, was waiting for his mom in their car when he heard the gunshots and heard his mother scream his name. According to Quentin, he jumped out of the car and saw his mother lying facedown on the ground. Three men were running from the credit union. Quentin ran to the side door of the credit union, where he banged on the door and yelled that his mother

had been shot. He was allowed inside, but was prevented from going to his mother's body.

Defendant's former fellow gang member Fennelle testified that a few weeks before this robbery and murder, Fennelle spoke with defendant and Bowen at the house of Sabrina Johnson. The two men told Fennelle that they were planning an armed bank robbery. They said they needed cars, and that they would collect a lot of money. They asked Fennelle if he wanted to participate. Fennelle refused and tried to convince Bowen and defendant not to do it. He warned them that if someone was killed in the robbery, they would be equally responsible for the murder. Defendant told him that he did not care and was determined to go ahead as planned. According to investigating officers, defendant admitted, in interviews after his arrest, that he was present during the robbery.[2]

Several witnesses testified concerning the impact of the robbery and shooting on them and their family as follows.

Jasper Altheide testified that she had difficulties after the robbery because during the robbery she had lain under the counter, and although she had the keys to the vault and could have given the robbers the money, she did not do so because she was so frightened. According to Altheide, she felt very guilty about not allowing Orciuch's son to see Orciuch after Orciuch was shot and felt directly responsible for her death. Every time she saw Orciuch's family, her heart hurt. Altheide had nightmares, was fearful, and no longer wanted to be around people.

---

[2]    In his application for a new penalty phase trial, defendant acknowledged that he was subsequently convicted of the Vandenberg Federal Credit Union robbery and murder and had received a sentence of life without the possibility of parole.

She constantly worried and had difficulty working at the credit union. She had counseling, and testified that "the innocence of living is gone."

Moira Philley testified that the robbery and shootings at the Vandenberg Federal Credit Union had a tremendous effect on her life. Her marriage almost "fell apart from it." She and her children were "freaked out" by it. She would not open the front door and installed an alarm system. She testified that she was constantly watchful, had anxiety attacks when at work, and eventually had to receive trauma counseling. She had nightmares of Quentin screaming, and felt guilty because she survived, but Orciuch did not. She knew the Orciuch family and felt for them. For years, the credit union maintained a memorial near the flower beds where Orciuch died and Philley found it terrible to watch Orciuch's husband light the candles every night and then blow them out every morning.

Octavio Gallardo testified that the shooting at the credit union caused him to be very fearful. For a time he was afraid to leave his apartment. He required medical attention for his gunshot wound and his leg still hurt when the weather was very cold.

Orciuch's husband, Chester Orciuch, testified that at the time of his wife's death, they had three children; a daughter age 17, a daughter age 14, and a son, Quentin, age 11. When he arrived at the hospital, he was taken to a room and told that his wife had been fatally shot. He screamed "Oh, no" and asked for his family. He was taken to another room where his eldest daughter was trying to comfort Quentin, who was asking if his mommy was okay. Chester told his children that their mother had gone to heaven. They went to the emergency room and said a prayer at her body. Chester was overwhelmed by her death. Christine had been the caretaker of the family and home-schooled all three children. Chester testified that he had difficulty as a single father and sometimes woke up in

19

the morning with dry heaves. There were also times that he woke up in the night screaming. According to Chester, he lacked focus at home and at work.

Quentin Orciuch testified that after his mother was shot and he was allowed into the credit union, he tried to page his father, but he was crying too hard. He tried to run outside to see his mother, but was stopped. Eventually, a fireman drove him to the hospital where he waited for his father and sisters to arrive. After they arrived, his father told him his mother had died. He was devastated. According to Quentin, everything was difficult after his mother's death. He thinks about her every day and spent approximately one and one-half years in counseling after her death.

### e. March 1998 attempted escape and carjacking

Defendant and Bowen were held in custody in the Santa Barbara County jail after their arrest for the Vandenberg Federal Credit Union robbery. On a morning in mid-March 1998, they escaped with another inmate from the jail exercise yard. According to witnesses, the three African-American male inmates were seen walking down the hill from the jail to a parking lot, where they surrounded Matilde Ulrich's car. One of the inmates pulled Ulrich from her car, while defendant got in on the passenger side and pushed Ulrich out. The inmates drove off in Ulrich's car, which was spotted by a sheriff's deputy a short time later and was chased by the California Highway Patrol. A spike strip was used to stop the car. Defendant, Bowen, and the third inmate were captured without further incident.

### f. Acts of force or violence or threats of force or violence while in custody

Witnesses testified concerning 12 different incidents involving defendant's use of force or violence, or threats of force or violence during the periods of time that he was held in custody as follows.

20

Defendant and Antoine Phillips were both in custody at Avenal State Prison in March 1994. The men were members of different Bloods gangs. Defendant started an argument with Phillips regarding the murder of one of defendant's "homegirls" by a member of Phillips's gang and they agreed to fight. A few weeks later, Phillips was lying on the grass of the prison yard when defendant walked up and kicked him in the mouth. Later that evening the two men fought and defendant broke Phillips's jaw.

In November 1997, Sheriff's Deputy Brian Parker was conducting a security check at the Santa Barbara County jail. Parker told defendant to remove several items that defendant had secured into his cell wall in violation of jail rules. Defendant became verbally abusive and challenged him to enter the cell and fight.

In November 1998, while he was in a holding cell at the Santa Maria courthouse, defendant broke a plastic coat hanger that had been used for his civilian clothes, took a large piece and began sharpening it to a point on the concrete floor. Defendant hid the other pieces of the coat hanger in clothing in the corner of the cell. Deputies entered the cell and took from defendant the sharpened piece of plastic, as well as the hidden pieces.

In September 2000, while he was being held in the Los Angeles County jail, defendant became upset when he was told that the nurse did not have his medication. Sheriff's Deputy Phillips directed defendant to calm down. Defendant challenged Phillips and two other deputies to enter his cell and fight him, threatening to harm them.

In February 2001, defendant was housed on the disciplinary row in the Los Angeles County jail. Defendant handed Sheriff's Deputy John Hermann a note and told him to post it in the guard booth so that everyone could see it. Defendant specifically said that he wanted Deputy Lindenmayer to see it. The note consisted of a cartoon drawing of stick figures, which depicted defendant announcing his

21

gang membership, beating up Lindenmayer, and Lindenmayer lying on the ground dead. Both Lindenmayer and Hermann took the note as a threat to Lindenmayer.

In July 2001, Sheriff's Deputy Charles Nowotny searched defendant's cell in the Los Angeles County jail and found a handmade "club" in a manila envelope in defendant's personal property. The club consisted of a tightly rolled-up newspaper with a torn white sheet wrapped around it to form a handle. This was a contraband item that could be used as a weapon.

In September 2001, sheriff's deputies were escorting defendant from the medical clinic to his single cell in a lockdown module of the Los Angeles County jail. When they arrived at defendant's cell, defendant saw a third deputy removing several gang photographs from his cell. Defendant began cursing and refused to enter his cell until his photographs were returned. Eventually defendant was convinced to go back inside his cell. However, while the deputies were removing defendant's handcuffs and waist chain, defendant pulled the chain into the cell and began swinging it, hitting the door and walls. Defendant yelled that he was "going to tear this place apart," and, "If I get out of here, I am going to tear you apart, too." The deputies were able to close the gate and secure the latch so that defendant could not hit them with the chain. It took approximately one hour to talk defendant into handing over the chain. During this time, defendant was cursing and threatening people.

Not quite three weeks later, sheriff's deputies approached defendant's cell in the Los Angeles County jail to provide defendant with his dinner. When defendant's food was passed through the food tray slot, defendant refused the food and threw a white watery liquid at Sheriff's Deputy Alejandro Martinez, saying, "Take that, fuckin' deputy." The liquid landed on Martinez's face and upper body. Sheriff's Deputy James Brown sprayed pepper spray into the cell so that the food slot could be closed. As the slot was being closed, defendant threw more of

the liquid at Brown, which landed on Brown's face and upper body. When Martinez sprayed additional pepper spray into the cell, defendant loudly said, "You fucking bitches," and attempted to throw more liquid at the deputies. Martinez testified that he did not know what the liquid was, but it might have come from a milk container. Martinez explained that when an inmate throws something at an officer, it is commonly called "gassing."

In February 2002, defendant complained to Sheriff's Deputy Martinez at the Los Angeles County jail that Deputy Valente kept "fucking with [him] and said that [he was] going to get him." Defendant gave Martinez a note that he wanted given to the floor supervisor. The note said, "I give you my word as a man that I will slice or stab this guy the first chance I get." Martinez understood the note to refer to Valente. After giving Martinez the note, defendant said he would "gas" a deputy if he were given the chance.

In June 2002, when defendant was housed in the Los Angeles County jail's "high power" module, a jail inmate trustee, Douglas Lance, was picking up trash and food trays along the walkway in the cell block. As Lance picked up a trash bag attached to defendant's cell, defendant reached through the bars with his left hand and swiped across the right side of Lance's neck. Lance cried out in pain and called for help. As Sheriff's Deputy Damien Ortega responded, Ortega heard the toilet flush in defendant's cell. Lance told Ortega that defendant had cut him. Lance had a two-and-one-half inch laceration from under his ear to the front part of his neck. The laceration was about one-quarter inch deep and was bleeding profusely. Lance was taken to the medical clinic, and subsequently transferred to an emergency room for treatment. When Ortega saw Lance two weeks later, he noticed a sizeable scar on Lance's neck.

In January 2003, Sheriff's Deputy Mat Taylor was sitting in the control booth at the Los Angeles County jail when he heard a loud thud against the

23

concrete wall of one of the rows of cells. Taylor looked down the row and initially saw nothing. But when he heard noises sounding like an assault, Taylor stood up and saw defendant on top of another inmate, Richard Aguirre. Only Aguirre was supposed to be out of his cell; defendant had escaped from his cell. Defendant was savagely striking Aguirre, who was curled up in a ball, and blood was "flying everywhere." When Taylor saw that each of defendant's blows was creating an injury that produced blood, he knew that a jail-made shank was involved. Taylor and his partner went down the row to break up the fight. Taylor pepper-sprayed defendant and Aguirre, but defendant continued to hit Aguirre. As additional deputies arrived, defendant ran back to his cell.

Taylor did not find any weapons on Aguirre, who was covered in blood. His clothing had multiple slash marks. Aguirre was taken to the medical clinic and then transferred to a hospital trauma center. Sometime after the incident, defendant told Taylor that he wished he had "finished the job" on Aguirre and that he should have done the job right the first time. Aguirre was a "validated" associate of the Mexican Mafia, which is a large Hispanic prison gang.

In March 2003, Sheriff's Deputy Thomas Davis searched defendant at the Los Angeles County jail before he was brought to court. Inmates in defendant's module were segregated so that they did not come into contact with other inmates and Davis was looking for, among other things, any notes that could be passed to other inmates during their transportation to court. During his search, Davis found a handwritten note at the bottom of a page of transcript. The note read, "Breezo is a rat . . . . Breezo and Marlo need to die." It was signed with defendant's gang moniker and other gang terms. According to Lompoc Police Officer Harry Heidt, who had been assigned to investigate the 1997 robbery and murder at the Vandenberg Federal Credit Union, the transcript on which the note was written was of a telephone conversation Heidt had in December 1997 with Sabrina

Johnson, known as "Breezo," regarding the conversation that had taken place at her apartment between defendant, Bowen, and Fennelle. (Fennelle had testified that the conversation concerned defendant and Bowen's plan to commit an armed bank robbery.) Heidt understood the term "rat" to refer to an informant or "snitch" and believed that the writer of the note wanted to have Johnson killed.

Defendant's mail was monitored while he was in the Los Angeles County jail. Several letters were confiscated. In those letters, defendant referenced his robbery of a credit union, his cutting of a "white boy with a razor blade in the face" while in custody, and his serious cutting and beating of "a Mexican" in January 2003 while in lockup.

### 2. Evidence submitted in aggravation under factor (c) of section 190.3

In September 1993, defendant was convicted of discharging a firearm with gross negligence. (§ 246.3.) He received a sentence of 16 months in prison. Defendant was paroled one year later, on September 3, 1994 — four days before the murders of Hicks, Boyd, and Armstrong.

### 3. Aggravating evidence of victim impact

#### a. Dayland Hicks

Dayland Hicks was 22 years old when he was killed. His uncle, Gregory Shoaf, testified that Hicks was respectful, quiet, good-natured, and "very lovable." He liked to play basketball, football, and video games. He enjoyed dancing, rapping, singing, and going to church. He was learning the Bible and taking "his life in that direction." Shoaf believed Hicks was on the right path, but never had the chance to straighten his life out. Shoaf loved Hicks like his own son. Shoaf was in shock when he received the news that Hicks had been killed. The hardest thing Shoaf had to do was tell Hicks's sister Jamise that her brother was dead. Hicks and Jamise were very close and Jamise had no family left after Hicks's

25

death, other than Shoaf and his family, because her mother and father had both died earlier.  Shoaf testified that he thought about Hicks every day and missed his smile and the things they did together.  Shoaf tried to look out for Hicks's son, who was four or five months old when Hicks was shot, but he knew he would never replace Hicks.  Hicks's death also "took a toll" on his grandmother.

Jamise Shoaf testified that she was nine years old when her brother was killed.  She cried when she was told of his death and it left her with an empty feeling.  He was her only sibling, and it was hard to go on without him.  She testified that she thought about his death every day.  She missed his laugh, his silliness, and watching television with him.

### b.  Lamar Armstrong

Lamar Armstrong was 19 years old when he was killed.  His mother, Doris Hayes, testified that Armstrong had enjoyed playing football and baseball, running track, and cooking.  He was a good son, worked part time at Home Base, a building supply store, and was in the process of getting his GED when he was killed.  Doris had difficulty believing Armstrong was actually dead.  She could not plan the funeral, and she suffered from nightmares.  She testified that she missed everything about him.  Holidays were particularly difficult.  Part of her died when her son did and she struggled every day.

Dan Hayes, Armstrong's stepfather, testified that he raised Armstrong from the time he was an infant.  He described his stepson as a "good kid," who enjoyed athletics and things that challenged his mind.  Dan had "an empty feeling" when told at the hospital that Armstrong had died.  He testified that it was very difficult to hold his family together after Armstrong's death.  According to Dan, his wife had "problems" on the anniversary of Armstrong's death, on his birthday, and on every holiday.  He characterized it as "a nightmare."  He testified that Armstrong's

two daughters cried on Father's Day because they did not understand why they could not see their father. Dan told the jury that he thought about Armstrong every day. His death affected not just the immediate family, but the extended family.

Milika McCoy testified that she was Armstrong's girlfriend and was eight months pregnant when he died. The night before, they had attended a Lamaze class together. Armstrong had just been promoted in his job, was a very nice person, and was excited about McCoy's pregnancy. McCoy collapsed when she was told that Armstrong had died after being shot. After his death, she did not want to wake up in the morning. Her daughter, Cherish, was born a little over a month later. At the time of trial, Cherish was eight years old. She asked about her father "all the time" and had difficulty with not having a "daddy." McCoy, similarly, had difficulty raising Cherish by herself. McCoy testified that she thought about Armstrong, her best friend, every time she looks at her daughter.

### c. *Trevon Boyd*

Carolyn Boyd, Trevon Boyd's mother, testified that Trevon was 20 years old when he died. She described him as a beautiful and intelligent person who enjoyed writing music, sports, fishing, and dancing. When Carolyn learned of her son's death, she felt like a part of her was gone. She could not eat or sleep, and it was difficult to make the funeral arrangements. Carolyn missed everything about her son. She testified that her family "will never be whole, . . . again." Holidays were difficult, and she thought about her son every day.

Olive Burgess testified that Trevon Boyd was her cousin. According to Burgess, Boyd was a "sweet kid" growing up in a rough neighborhood. He meant everything to her. His death made her feel numb and the family still cried at night. The hardest thing for Burgess to do after Boyd's death was to explain it to her

children, who were all close to him.  They found it difficult to cope with his death, and she missed his smile and thought of him every day.

### 4.  Mitigating evidence offered by defendant

The defense case in mitigation included evidence of defendant's family history and upbringing, as well as opinion testimony by three expert witnesses who described for the jury defendant's learning disabilities and his psychological, neurological, and intellectual dysfunction.  The defense also presented evidence that defendant possessed a genetic condition that, when combined with childhood maltreatment, has been identified as a risk factor for antisocial behavior.

### a.  Defendant's upbringing and background

Defendant's mother, Pearl Thomas, testified that she had a poor relationship with her own mother and ran away from home when she was 12 years old.  She got into trouble and was sent to CYA when she was 15.  She became a single mother at the age of 17 when she gave birth to defendant's older brother, who became known as "Big Sonny."  Thomas denied drinking alcohol, but admitted being a drug user, and taking barbiturates when defendant was conceived.  Defendant's father was a professional boxer with whom Thomas had a short relationship.  Defendant's father was a heroin addict and was not significantly involved in defendant's life.

When defendant was a toddler, Thomas married Ronald Biggles.  He was abusive to Thomas and often came home drunk.  Biggles favored his own daughter over defendant and Big Sonny.  He hit defendant.  After Thomas left Biggles, she lived with James Wright, who disliked and hit defendant.  Thomas testified she also hit and whipped defendant because that was the way she was raised.  She did not know how to be a good mother.

Thomas supported her family with public welfare assistance and by stealing. She estimated that she had been arrested almost 50 times in her life and she was in and out of custody during defendant's childhood. When Thomas was in prison, defendant sometimes stayed with his grandmother, Amy Parks. According to Beverly Parks, who was Parks's daughter-in-law and defendant's aunt, Parks seemed to hate defendant and his sister Larhonda. She often drank and became "wild and . . . brutally violent." Defendant suffered excessive beatings, almost every day, when he was staying in his grandmother's house. Parks also abused the children by calling them names. One time she scared defendant and Larhonda by turning off the lights and following them around with a long knife. She believed in voodoo and performed "curses" on people. She was described as being "evil" by both Beverly Parks and defendant's godmother, Linda Gavin. Gavin testified that Parks showed her evilness to "anyone she didn't like" and she particularly disliked defendant and his sister Larhonda. According to Gavin, Parks would sometimes call on the telephone and tell her to come get "these motherfuckers," referring to defendant and his sister.

Defendant was an energetic and very hyperactive child. He had learning disabilities and was sent to special-needs schools. Defendant was prescribed Ritalin, but his mother took him off the medication. He was bullied and picked on, particularly by one member of a local Crips gang. Defendant started getting into trouble at an early age. But one childhood friend of defendant's, Reginald Campbell, recalled an incident in which defendant jumped into the swimming pool and saved him from drowning.

Several witnesses (Reginald Campbell, Linda Woods, a neighbor who watched defendant grow up, defendant's half sister Ralene, and his aunt Beverly Parks) testified about the rough neighborhood in which defendant grew up. It was filled with drugs and numerous gangs, which actively recruited members through

29

violence, including stabbings, carjackings, and shootings. The witnesses explained that to acquire protection in the neighborhood, a person had to join a gang. Defendant found protection by joining the Bloods gang to which his brother, Big Sonny, belonged. Big Sonny was a violent person and well known in the neighborhood. Defendant, however, idolized him and saw him as a father figure. Defendant was devastated when Big Sonny was killed in a gang shooting, which increased his hatred for Crips gang members.

### b. Expert witness testimony in mitigation

Dr. Nancy Cowardin, who had a doctorate in educational psychology and special education, testified as an expert witness regarding learning disabilities. She assessed defendant by reviewing documents regarding his personal background, meeting with him and giving him current tests of his skills. She noted that defendant started needing remedial help in the first grade or shortly thereafter. He attended special-needs schools in grades eight and nine. In eighth grade, his individualized education program (IEP) included a dual diagnosis of being seriously emotionally disturbed and having learning disabilities with attention deficits. Defendant's IEP in ninth grade similarly assessed him as being seriously emotionally disturbed. According to Cowardin, defendant had a clear history of attention deficit disorder (ADD). His records from CYA indicated he was very impulsive and lacked sound decisionmaking skills. Cowardin performed a complete psychoeducational assessment of defendant and concluded his ADD was still present in adulthood, but was more subdued. She found that he had an auditory processing problem that could account for his learning disabilities in reading and writing at school. As an adult, defendant had improved his reading and written language scores, but not his math scores. Defendant's IQ was exactly average when verbal and nonverbal scores were combined, but he had large

30

deviations in some of the scores. Cowardin found that defendant had lapses in mature executive functions that control problem solving, decisionmaking, and adaptability under stress in typical adults. She concluded that defendant's disability profile may have led to some of his self-control problems.

Dr. Arthur Kowell, a specialist in neurology, evaluated defendant's brain function. He interpreted a brain electrical activity mapping study or "BEAM" test conducted on defendant in August 2000. Three of the four parts of the test — the standard electroencephalogram, the electroencephalogram spectral analysis, and an auditory "evoked potential" test — had normal results. But the visual evoked potential test showed some abnormal functioning of defendant's brain in the vertex, the right parietal region, and the right frontal region. The vertex deals with motor behavior and initiation of activity. The right parietal region deals with sensory functions and the right frontal lobe deals with impulse control and executive functions. An abnormality in this last area might indicate the individual has a short temper or possibly a form of ADD. Kowell testified that the test was nonspecific as to the time of onset and the causation for any abnormality shown and that the test was not predictive of behavior. But Kowell concluded the test showed evidence of brain dysfunction.

Dr. Kowell reviewed defendant's medical records, which included two positron emission tomography (PET) scans and a magnetic resonance imaging (MRI) scan of defendant's brain. The results of a 1998 PET scan showed abnormalities, while the results of a followup MRI and a second PET scan in 2000 were normal. Kowell did not consider the latter tests to be inconsistent with his results. He testified that a neuropsychological workup done by Dr. Kyle Boone in 2002, which he reviewed, showed abnormalities consistent with Kowell's testing. Kowell noted Boone's opinion that defendant's decisionmaking skills were comparable to those of someone with mental retardation or borderline intelligence,

31

despite defendant's otherwise normal intelligence. Kowell stated that, according to Boone, defendant may lack the essential brain equipment to exert reasoned control over his behavior. Kowell also reviewed defendant's academic records, mental health records, and court records. He considered the historical evidence from defendant's records to be consistent with his finding of abnormal brain function in defendant.

Dr. Carl Osborn, a forensic psychologist, testified that scientific studies had shown that childhood abuse and neglect, i.e., maltreatment, alters the brain chemistry and functioning in ways that can produce aggressive behavior and that these changes will persist into adulthood. According to Osborn, it had recently been shown that there is a powerful association with severe antisocial behavior later in life when childhood maltreatment combines with the presence of an inherited type of gene, the 3-repeat allele MAOA gene. Genetic testing of defendant showed that he had inherited the 3-repeat allele MAOA gene and, in Osborn's opinion, defendant had been severely maltreated as a child. Osborne testified that the 3 repeat allele MAOA gene is not a genetic defect, but is a risk factor.

## II. DISCUSSION

### A. Guilt Phase Issues

#### 1. *Background regarding "witness intimidation" comments by the prosecutor, evidence, and related jury instruction*

Dyer and Meeks were eyewitnesses to defendant's shooting of Hicks, Armstrong, and Boyd. But neither Dyer nor Meeks immediately identified defendant to the police as the shooter. Both refused to cooperate with law enforcement at various points in time and told investigators that they could not identify the shooter. In his guilt phase opening statement, the prosecutor acknowledged that the case had taken a long time to come to trial, but told the jury

32

that the explanation would lie in the evidence of "threats," "fear," and "intimidation" of the witnesses, which would explain their reluctance to come forward and speak with police. The prosecutor referred to there being in the case a "theme" of such threats, intimidation, and fear.

The prosecutor elaborated that Dyer was himself a gang member, that he initially did not want to get involved, and that he came forward and identified defendant as the shooter only at the urging of the victims' family members. The prosecutor explained that when Dyer was subsequently asked to identify defendant at a lineup, Dyer was being held in custody with defendant and knew that it was very dangerous to testify against another inmate. The prosecutor said that Dyer was frightened and then intimidated when he encountered defendant and was told by him that defendant had a relative who was a deputy sheriff. According to the prosecutor, Dyer did not identify defendant in the 1995 lineup and later told lies to the defense investigator because of his fear. The prosecutor told the jury that years later, when the investigation was reopened, Dyer "felt bad' about not identifying defendant in 1995 because "the victims were friends of his." Dyer revealed to prosecution investigators that he had been threatened and that the threats and intimidation he felt were the reasons for his earlier refusal to identify defendant.

Continuing his opening statement, the prosecutor told the jury that Meeks was very afraid back in 1994 and 1995, consuming a lot of drugs, and hence reluctant to talk to the police. She did not want to get involved, and did not want to get Dyer involved. But, the prosecutor explained, Meeks also had a change of heart. She had been sent to prison on a drug charge and while she was in prison, she turned her life "completely around." According to the prosecutor, Meeks explained to investigating detectives that she felt she had "to do the right thing" and that she knew who the shooter was because he had been just a few feet away

from her.  She told investigators that in the past she had been afraid to identify defendant for several reasons.  The prosecutor explained those reasons as follows: "[Meeks's] family had been threatened back in 1994 and 1995.  They had found out — someone had found out her address of her cousin and where her cousin lived and they received phone calls, and it was made quite clear to her that she [should] not say anything when she went to court.  And she kept that promise until she went to prison, got off drugs and got back straightening her life up, and now she has indicated the identification of the defendant."

The prosecutor further told the jury that "this concept of fear and retaliation" would also come up with respect to other witnesses.  He proceeded to very briefly describe the anticipated testimony of Johnson and Fennelle.  The prosecutor then warned the jurors that they might see witnesses who might not want to testify and who were very afraid to testify, but suggested it was "in the nature of these types of cases."

### 2.  *Defendant's claims*

Defendant complains on appeal that the prosecutor, by these comments, "poisoned" the jury against a fair assessment of his defense that these witnesses were not credible.  He contends that the prosecutor impermissibly vouched for Dyer and Meeks when he described their change of heart.  And, he argues, the prosecutor's accusations, express and implied, that defendant was involved in this campaign of intimidation were prejudicial because they were never substantiated.  Embedded in his claims regarding the prosecutor's opening statement are contentions regarding the admissibility of the witness intimidation evidence, the trial court's related consciousness of guilt instruction, and the prosecution's closing argument.  By his failure to object and raise the claims he now asserts,

34

defendant forfeited his contentions on appeal.  As we explain, they are meritless in any event.

Most of defendant's claims assert prosecutorial misconduct.  The principles of law applicable to a defendant's claims of prosecutorial misconduct are well settled.  " ' "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." [Citation.]  When a claim of misconduct is based on the prosecutor's comments before the jury, as all of defendant's claims are, " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " [Citation.]  To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument. [Citation.]' [Citation.]  A failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm." (*People v. Linton* (2013) 56 Cal.4th 1146, 1205.)

As the Attorney General notes, defendant never objected at trial to any of the prosecutor's comments that he now asserts are prejudicial.  Nothing suggests an objection would have been futile or an admonition inadequate to cure any harm.  Thus, his claim of misconduct during the opening statement is forfeited.  (*People v. Tully* (2012) 54 Cal.4th 952, 1011.)

Moreover, the comments were not improper.  "The function of an opening statement is not only to inform the jury of the expected evidence, but also to prepare the jurors to follow the evidence and more readily discern its materiality,

force, and meaning." (*People v. Dennis* (1998) 17 Cal.4th 468, 518.)  Here, the prosecutor's statements sought to prepare the jurors for the anticipated testimony of Dyer, Meeks, Johnson, and Fennelle and to offer in advance a possible explanation for their long delay in cooperating with law enforcement, their inconsistent statements to investigators, and any current reluctance to testify.

We do not agree with defendant's claim that the prosecutor failed to state the facts correctly or that his comments were unsubstantiated by the evidence admitted at trial.  Dyer testified that he failed to immediately identify defendant as the shooter because Dyer was himself a gang member and a gang member would be labeled a "snitch" if he spoke to the police about a gang-related crime, even if the crime was committed by a rival gang against the member's own gang.  Dyer testified that he was afraid to talk to the police about the shooting, and did not want to get involved, because people — inferentially other gang members — would try to hurt him.  Defendant concedes that this testimony was admissible.

Dyer testified that he changed his mind about keeping silent after several family members of Hicks and Boyd convinced him to tell the police what he knew about the killing of his friends.  He identified defendant as the shooter in a photographic lineup at that time.  But he was subsequently taken into custody and held in the same facility as defendant.  Dyer testified that because he was afraid of what could happen to him in jail if he was labeled a snitch, he did not identify defendant when he was asked to view a live lineup.  He testified that he was later taken by a sheriff's deputy, whom defendant identified as his cousin, to an office where defendant was waiting.  Defendant had a copy of Dyer's earlier interview statement to police identifying defendant as the shooter, which defendant showed to Dyer.  According to Dyer, defendant told him not to say anything and offered to arrange for Dyer to be transferred to a safe facility as long as Dyer did not identify defendant as the shooter.  Dyer told defendant he had not identified him in the live

36

lineup and assured defendant he did not intend to "tell on [him]."  Dyer testified

that he was concerned that if his interview statement "[got] around the jail" he

could be hurt or killed and he knew he could not cooperate with the prosecution

once he was incarcerated.  According to Dyer, he received threats both before and

after the lineup.  During the time he remained in custody, including the time he

spent at a CYA facility, Dyer continued to deny knowledge of the shooting.

Defendant did not object to the admission of Dyer's testimony, which in

any event was properly admitted at trial.  "As we have recognized, '[e]vidence that

a witness is afraid to testify or fears retaliation for testifying is relevant to the

credibility of that witness and is therefore admissible.  [Citations.]  An explanation

of the basis for the witness's fear is likewise relevant to [his] credibility and is

well within the discretion of the trial court.  [Citations.]' " (*People v. Mendoza*

(2011) 52 Cal.4th 1056, 1084.)  Dyer's testimony substantiated the prosecutor's

opening comments.

Defendant claims, however, that the prosecutor's comments were

inaccurate and prejudicial because Dyer never testified that he was intimidated by

defendant *before* he failed to identify defendant in the live lineup, and in

defendant's view, any fear Dyer felt was not due to defendant's action or any

action authorized by him.  It was unnecessary, however, for Dyer's fear to be

directly linked to defendant in order for it to be admitted for purposes of assisting

the jury in determining his credibility. (*People v. Williams* (2013) 58 Cal.4th 197,

270; *People v. Mendoza, supra,* 52 Cal.4th at p. 1087.)  We find *People v. Hannon*

(1977) 19 Cal.3d 588 and *People v. Weiss* (1958) 50 Cal.2d 535, on which

defendant relies, to be distinguishable on this ground.  (*People v. Abel* (2012) 53

Cal.4th 891, 924-925.)

Furthermore, although it appears that Dyer's fear was partially due to the

general risk of gang retaliation and retribution from other inmates if he cooperated

with law enforcement and identified defendant as the shooter, Dyer also testified that he was intimidated and frightened by defendant directly. Specifically, Dyer testified that he was brought by a sheriff's deputy, whom defendant identified as his cousin, to an office in the jail to meet with defendant. Dyer testified that defendant had in his possession and showed Dyer a copy of Dyer's previous interview statement to police. Defendant then offered to arrange a transfer for Dyer to a safe facility if Dyer continued to keep silent about what he witnessed. Implied in this encounter was a threat by defendant to publicize Dyer's police interview statement to the inmate population, thereby labeling him as a snitch, if Dyer did not maintain his silence. Defendant's actions and comments also emphasized to Dyer the risk of any return to cooperation with law enforcement and intimated that he (defendant) had power over Dyer's movements, housing and safety while Dyer was in custody. Contrary to defendant's claim, the jury could determine from Dyer's testimony that defendant successfully intimidated and frightened Dyer. Defendant's direct involvement in persuading Dyer of the risk of being a witness distinguishes the circumstances of this case from *Dudley v. Duckworth* (7th Cir. 1988) 854 F.2d 967, on which defendant relies because *Dudley* involved third party threats unconnected to the defendant. (See *People v. Williams* (1997) 16 Cal.4th 153, 212.) In anticipation of Dyer's admissible testimony, the prosecutor's opening statement did not improperly connect defendant to Dyer's fear.

In a related claim, defendant complains of the prosecutor's closing argument referencing defendant's threats and intimidation of Dyer in jail and Dyer's fear of retaliation while he was being held in custody. His failure to object forfeited his claim, which is also meritless. Because the evidence was properly admitted, the prosecutor's closing argument constituted fair comment on the

evidence and fell within the permissible bounds of argument. (*People v. Williams* (2013) 56 Cal.4th 630, 674.)

We likewise reject defendant's further related contention that his right to due process was violated when the trial court instructed the jury with the consciousness of guilt instruction, CALJIC No. 2.06. The testimony of Dyer regarding his meeting with defendant in jail supported the use of CALJIC No. 2.06, which informed the jury that if it found defendant attempted to suppress evidence against himself, "such as by the intimidation of a witness," it could consider that as a circumstance tending to show consciousness of guilt.

We also find no impropriety in the prosecutor's opening comments regarding Meeks. Defendant did not object to the evidence that Meeks was afraid to cooperate with police because of her concern for her own and her family's safety. Like the testimony of Dyer, her testimony was admissible in any event because it was relevant to her credibility. Again, contrary to defendant's argument, it was unnecessary for the prosecution to establish that defendant was connected to the phone call to Meeks's family warning Meeks to keep silent in order for Meeks's testimony concerning the phone call to be admissible. (*People v. Williams, supra,* 58 Cal.4th at p. 270; *People v. Mendoza, supra,* 52 Cal.4th at p. 1087.) Because the prosecutor could in good faith anticipate the admission of supporting testimony, the prosecutor was entitled to comment in his opening statement on Meeks's fear of retaliation.

We reject defendant's additional claim that the prosecutor impermissibly vouched for the credibility of Dyer and Meeks in his opening statement by asserting that they "had" changed their lives, instead of stating that they "claimed" to have changed their lives. The prosecutor's comments appropriately anticipated the testimony of Dyer and Meeks and there is no reasonable likelihood that the jury would have understood the comments as vouching for these witnesses'

39

credibility based on the prosecutor's personal belief. (*People v. Martinez* (2010) 47 Cal.4th 911, 958 [a prosecutor "may not vouch for the credibility of a witness based on personal belief or by referring to evidence outside the record"].)

In another challenge to the prosecution's use of evidence of witness intimidation and fear of retaliation, defendant contends that the trial court erred in admitting evidence that special precautions had been taken to protect witnesses Johnson and Fennell during and after defendant's trial because there was no evidence defendant was threatening or intimidating them. Defendant failed, however, to object on this ground, which would properly have been overruled in any case. Johnson and Fennelle, both former gang members who were incarcerated at the time of trial, agreed to testify against defendant, their former friend and fellow gang member. Their willingness to do so despite a legitimate basis for concern about their safety enhanced their credibility. (*People v. Green* (1980) 27 Cal.3d 1, 20; see *People v. Verdugo* (2010) 50 Cal.4th 263, 285.) Again, there was no need for evidence directly linking defendant to the prosecution's concern for their safety in order to establish admissibility. (*People v. Williams, supra,* 58 Cal.4th at p. 270; *People v. Mendoza, supra,* 52 Cal.4th at p. 1087.)

Defendant has failed to show any error in the prosecution's introduction of and comment on evidence of witness intimidation and fear of retaliation. Nor was there any instructional error related to such evidence.

**B. Penalty Phase Issues**

### 1. *Admission of victim impact testimony relating to aggravating evidence of uncharged crimes*

Over defense objection, a number of the victims of the uncharged robberies committed by defendant and his companions were allowed to testify regarding the impact of those crimes on their lives. Melissa Lopez testified to the traumatic

effect on her of the robbery of the Pacific Marine Credit Union. Jasper Altheide and Moira Philley, two of the tellers at the Vandenberg Federal Credit Union, testified to the continuing negative impacts on their lives, not only from the robbery but also from witnessing the killing of Christine Orciuch. In addition to the robbery victims, Orciuch's son Quentin testified to the painful effects on him caused by his mother's sudden death at the credit union. Orciuch's husband Chester likewise testified about the suffering he and his family experienced as a result of his wife's death. He described the difficulties he faced as a single parent and the residual emotional effect on him of her death.

Defendant recognizes that we have held that victim impact evidence related to a defendant's uncharged crimes is admissible under section 190.3, factor (b). (*People v. Brady* (2010) 50 Cal.4th 547, 581-582; *People v. Bramit* (2009) 46 Cal.4th 1221, 1241; *People v. Demetrulias* (2006) 39 Cal.4th 1, 39.) He asks us, however, to revisit the issue in light of *Payne v. Tennessee* (1991) 501 U.S. 808. Defendant fails to persuade us that there is reason to do so. "Under *Payne*, victim impact testimony is unconstitutional when it is 'so unduly prejudicial that it renders the trial fundamentally unfair . . . .' " (*People v. Montes* (2014) 58 Cal.4th 809, 884.) The circumstances of defendant's uncharged violent criminal conduct, including its direct impact on the victims of that conduct, was relevant to the jury's penalty determination and its admission did not render defendant's trial constitutionally unfair.

### 2. *Alleged prosecutorial misconduct in penalty phase closing arguments*

Defendant contends the prosecutor committed prejudicial misconduct during his closing argument in the penalty phase by (1) suggesting that the testimony of Beverly Parks regarding the childhood abuse of defendant by his grandmother was unreliable because defendant's sisters did not testify and confirm

41

such abuse, and (2) arguing that a verdict of life without the possibility of parole would reward defendant with a "freebie" for Orciuch's death and the other aggravating crimes. We reject defendant's claims.

We earlier set forth the applicable standard of review for claims of prosecutorial misconduct at the guilt phase. (See *ante*, pt. II.A.2.) The same standard applies to asserted misconduct at the penalty phase. (*People v. Lopez* (2013) 56 Cal.4th 1028, 1075.)

### a. Prosecutor's argument regarding defendant's mitigating evidence of childhood abuse by his grandmother

Defendant presented evidence in mitigation that when he stayed as a child with his maternal grandmother, Amy Parks, he was verbally and physically abused by her. During closing argument, the prosecutor told the jury that he found it interesting that defendant's aunt, Beverly Parks, was the only person in the household who came into court to testify that the grandmother beat defendant. The prosecutor argued that Beverly Parks was a woman "who [did not] like the grandmother to begin with" and that she was, therefore, "somewhat of a suspect witness." The prosecutor asked the jury to consider her demeanor during her testimony and asserted that "[s]he testified to a few things that she didn't even observe, that she had heard, but you saw her answers, so you have to weigh how much that evidence really means and you also have to consider the fact that no one else from that household — her daughters, Mrs. Parks's daughters didn't testify and they were there. Jimmy Parks, her husband, didn't testify, and he could have testified that the grandmother beat on defendant, nor did any of the defendant's sisters testify that the grandmother mistreated the defendant." Acknowledging that it was up to the jury to evaluate the testimony, the prosecutor explained he was pointing this out "because I think there is a certain suspicion you should have

regarding that testimony, especially in light of all the other witnesses that could have testified." Defendant did not object to any of these comments.

After the jury reached a verdict of death, defendant filed a motion for a new penalty phase trial. He contended, in part, that he was entitled to a new trial because the prosecutor argued that defendant's sisters failed to corroborate the testimony of Beverly Parks when in fact the prosecutor was in possession of reports of interviews that defendant's sisters gave to defense investigators, which verified the abuse of defendant by their grandmother. Copies of the reports were attached to the motion and at the hearing on the motion, the prosecutor stipulated that the reports were received by his office as part of discovery. The trial court denied the new trial motion, concluding that any error that may have occurred in the prosecutor's argument would not have affected the outcome of the case in light of the circumstances of the crimes and the additional evidence in aggravation.

Defendant now reasserts his contention that the prosecutor committed prejudicial misconduct by knowingly arguing a false inference that defendant's sisters would not have confirmed their grandmother's abuse of defendant had they testified. He relies on, among other cases, *Berger v. United States* (1935) 295 U.S. 78, 88, *People v. Hill* (1998) 17 Cal.4th 800, 829, and *United States v. Blueford* (9th Cir. 2002) 312 F.3d 962. Defendant claims that the prosecutor's comments purported to tell the jury why these sisters were not called as witnesses by the defense and what their testimony would have been, thereby depriving defendant of his Sixth Amendment right to confront and cross-examine witnesses. (*People v. Gaines* (1997) 54 Cal.App.4th 821, 825.)

Defendant failed to object and request an admonition regarding these comments at trial. Nothing in the record suggests that an objection would have been futile or that an admonition would have failed to cure any harm. We conclude, therefore, that defendant forfeited his challenges to these comments.

43

(*People v. Linton*, *supra*, 56 Cal.4th at p. 1205; *People v. D'Arcy* (2010) 48 Cal.4th 257, 289-290 [the failure to object on the basis of the 6th Amend. forfeits the constitutional objection].)

Moreover, we agree with the trial court that it is not necessary to determine whether the prosecutor's comments were improper because even assuming, solely for purposes of argument, that they were, defendant was not prejudiced thereby. First, there was other evidence that tended to bolster Beverly Parks's credibility, diminishing the likelihood that the jury would discount her testimony on the grounds suggested by the prosecutor. Specifically, defendant's godmother testified about the grandmother's "evilness" and corroborated Beverly Parks's description of the grandmother's verbal abuse of defendant and his sister Larhonda. Second, defendant submitted evidence of other serious physical mistreatment that he received during childhood at the hands of his mother, his mother's husband and his mother's boyfriend. And finally, the circumstances of the triple murder were egregious and the additional evidence in aggravation was extensive. In light of the totality of the evidence before the jury, we agree with the trial court that there was no reasonable possibility the jury would have reached a more favorable verdict in the absence of this argument. (*People v. Gonzales* (2011) 51 Cal.4th 894, 953 [the reasonable possibility standard of prejudice applies to the evaluation of the effect of improper argument at the penalty phase].)

### b. *Prosecutor's argument that murder of Orciuch would be a "freebie" if the jury did not return a verdict of death*

Defendant contends that the prosecutor committed prejudicial misconduct in the penalty phase by arguing that a death verdict was required in order to punish defendant for the murder of Christine Orciuch during the Vandenberg Federal Credit Union robbery, and that a verdict of life without the possibility of parole would reward defendant with a "freebie" for Orciuch's death and the other

44

aggravating crimes. Defendant asserts that aggravating evidence of a defendant's other violent conduct is admitted under section 190.3, factor (b), not to punish the defendant for the factor (b) conduct, but to help the jury determine the appropriate penalty for the special circumstance murder. Moreover, he alleges, the prosecutor knew it was false to imply defendant would escape punishment for the murder of Orciuch because the prosecutor was aware that defendant had been convicted of that crime and received a sentence of life without the possibility of parole. Some additional background is necessary to properly consider defendant's contentions.

The prosecutor started his closing remarks with an overview of the penalty issue before the jury. The prosecutor then discussed his view of the statutory mitigating factors, which he contended were either inapplicable or lacked persuasive support. Moving on to the aggravating factors, the prosecutor started with section 190.3, factor (a), emphasizing how horrible were the execution-style murders committed by defendant. He noted that once defendant murdered Hicks and Boyd, the penalty that defendant faced was either life in prison without the possibility of parole or the death penalty. The prosecutor characterized a sentence of life without the possibility of parole as the minimum sentence and urged the jury to reach a death verdict, contending that the circumstances of the killing of Hicks and Boyd were in themselves "substantial enough to outweigh the mitigating factors." The prosecutor argued that if, however, the jury determined that the circumstances of the two murders were not enough to warrant a death sentence, there was the third murder to consider. The prosecutor contended that defendant deserved additional punishment for Armstrong's murder and asked the jury not to treat Armstrong's murder as "a freebie."

The prosecutor then turned to discuss defendant's attempted murder of Hernandez and carjacking of Gonzalez, arguing that if the jury was not convinced

45

defendant deserved the death penalty for the three earlier murders, these additional crimes justified a death verdict.

The prosecutor next reviewed the evidence of defendant's felony conviction and his other violent crimes, including the two credit union robberies, emphasizing that defendant repeatedly engaged in criminal conduct when he was incarcerated and soon after each time he was released. In the course of summarizing the evidence of the Vandenberg Federal Credit Union robbery and discussing defendant's responsibility for the crimes directly committed by his companions, the prosecutor stated the following: "I will stop at this point again and say the same thing I said earlier. If all the previous aggravating evidence doesn't outweigh the mitigating evidence, another robbery and another murder certainly do. And if you choose the other direction, then you are basically saying this is a freebie, we are not going to impose any additional punishment on this defendant for the murder of Christine Orciuch. We are still going to give him life in prison without the possibility of parole. This is a freebie." The prosecutor then resumed review of defendant's other violent criminal conduct, focusing on his conduct while he was held in custody. Going back to "the same theme" he mentioned before, the prosecutor argued in summary that "all these other additional crimes, the additional crimes that — of the robberies, the carjackings, the other bank robberies, all of these are just additional, . . . additional, additional and additional crimes. And if you are to decide that life without the possibility of parole is the correct verdict, you are basically going to say, as I mentioned before, this is a freebie, the defendant gets this free. The murder of Christine Orciuch, we are just going to ignore that." The prosecutor emphasized that the aggravating evidence reflected "a collage of an extremely violent history, violence and greed" and argued that defendant did not deserve the jury's sympathy or mercy. Throughout

46

his argument, the prosecutor continued to use the language of comparison and weight of the circumstances in urging that a death verdict was justified. (§ 190.3.)

In his final argument, the prosecutor again addressed the mitigating evidence presented by defendant and urged the jury to conclude that it did not establish that defendant deserved sympathy. He repeated that defendant was eligible for the death penalty because he had committed two murders and claimed that the defense wanted the jury to ignore all the other aggravating evidence. The prosecutor asserted that the defense "wants to say, no, just give him the minimum, just give him a freebie, give him a freebie on the third murder, on the attempted murders, on the robberies, on all of the other crimes of violence, we are not going to punish you anymore. We will just stop at the two murders." The prosecutor concluded by urging the jury to impose the death penalty as the "fair" and "just" penalty that defendant deserved.

Defendant did not object to the prosecutor's arguments, including any of the "freebie" comments. Defendant raised this claim of prosecutorial misconduct only in his postverdict application for a new trial, which, as mentioned earlier, the trial court denied. Once again, defendant has forfeited the claim on appeal by failing to timely object and request an admonition from the trial court. (*People v. Linton*, *supra*, 56 Cal.4th at p. 1205.) Moreover, we are not persuaded that the prosecutor committed misconduct in his argument, or that, if any misconduct occurred, it was prejudicial.

" 'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Dykes* (2009) 46 Cal.4th 731, 771-772.) Here, the

47

prosecutor's lengthy argument, viewed as a whole, built on defendant's eligibility for a death sentence after his commission of the murders of Hicks and Boyd. It essentially contended that defendant deserved the death penalty for the charged triple murders because of the totality of the circumstances of the killing of Hicks, Boyd, and Armstrong when considered in light of all the aggravating evidence of defendant's violent conduct before and after those three murders. (*People v. Stanley* (1995) 10 Cal.4th 764, 822.)

We have recognized as appropriate a similar prosecutorial argument urging that three murders warranted a death verdict to avoid a "freebie" for the third murder. (*People v. Rogers* (2009) 46 Cal.4th 1136, 1174 & fn. 23.) Defendant contends, however, that "[w]hile it may be appropriate to make such a freebie argument with regard to a third murder directly committed by a defendant . . . , it is improper to make this 'freebie' argument with regard to factor (b) crimes, as the prosecutor did here." Although it is possible a prosecutor's use of the term "freebie" in connection with section 190.3, factor (b), evidence might in a particular case mislead a jury regarding its proper focus under section 190.3 in reaching a penalty verdict, and a prosecutor should be particularly careful in this regard, we are not convinced the prosecutor's argument in this case crossed the line into misconduct. In the context of the entirety of the prosecutor's argument, the jury would likely have understood him to be contending that when defendant's involvement in the Vandenberg Federal Credit Union robbery and murder of Orciuch and the other factor (b) evidence was added to the jury's consideration of the appropriate penalty for the three murder convictions, a death verdict was all the more warranted — not that it was the jury's responsibility to impose separate punishment on defendant for Orciuch's murder.

Furthermore, here the jury was instructed about how to properly evaluate the evidence submitted in aggravation and mitigation. (CALJIC Nos. 8.85, 8.87,

48

8.88.)  The jury also was instructed that in the penalty phase of trial it could be influenced by pity or sympathy for defendant, allowing the jury to view defendant's mitigating evidence as compassionately as it wished.  The jury was specifically told that statements made by the attorneys during the trial do not constitute evidence, and that it must accept and follow the law as stated by the trial court.  (CALJIC Nos. 1.02, 8.84.1.)  We presume the jury followed the trial court's instructions.  (*People v. Harris* (2013) 57 Cal.4th 804, 852.)  And we conclude that in light of the totality of the evidence presented at the penalty phase, there is no reasonable possibility that the jury would have returned a different penalty verdict absent the prosecutor's "freebie" argument concerning Orciuch's murder.  (*People v. Gonzales*, *supra*, 51 Cal.4th at p. 953.)

### 3.  Alleged penalty phase instructional errors

#### a.  Instructing the jury with CALJIC No. 8.85

CALJIC No. 8.85 instructs the jury regarding the aggravating and mitigating factors listed in section 190.3, factors (a) through (k), which, if relevant, the jury must consider in deciding the penalty to be imposed on a capital defendant.  Defendant asserts the instruction is constitutionally flawed because (1) it fails to instruct the jury as to which of the listed sentencing factors may be considered aggravating and which may be considered mitigating and (2) it uses the restrictive modifiers "extreme" and "substantial" in describing the sentencing factor of defendant's mental or emotional disturbance.  As defendant recognizes, we have repeatedly rejected these contentions.  (See e.g., *People v. Lindberg* (2008) 45 Cal.4th 1, 50-51; *People v. Farnam* (2002) 28 Cal.4th 107, 191-192.)  Defendant fails to persuade that reconsideration is necessary on the ground that our previous cases have failed to adequately address his arguments.  (See, e.g., *People v. Rodriguez* (2014) 58 Cal.4th 587, 649 ["[T]he catchall instruction

permits the jury to consider *any* evidence the defendant offers in mitigation, including any lesser mental or emotional disturbance"]; *People v. Dickey* (2005) 35 Cal.4th 884, 928 ["[T]he aggravating or mitigating nature of the factors is self-evident within the context of each case"].)

### b. *Instructing the jury with CALJIC No. 8.88*

The jury was given CALJIC No. 8.88 concerning how to consider and weigh the mitigating and aggravating evidence. Defendant claims the instruction violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution. As defendant concedes, we have previously considered and rejected these arguments. We do so again because defendant fails to persuade us that our prior decisions were erroneous.

Thus, we repeat that CALJIC No. 8.88 is not " 'unconstitutional for failing to require the jury to return a verdict of life should it determine the mitigating circumstances outweigh the aggravating ones.' " (*People v. Suff* (2014) 58 Cal.4th 1013, 1078; accord, *People v. Hovarter* (2008) 44 Cal.4th 983, 1028.) The instruction "is not constitutionally defective for failing to inform the jury that it has the discretion to impose a sentence of life without the possibility of parole even in the absence of mitigating circumstances." (*People v. Linton, supra,* 56 Cal.4th at p. 1211.) CALJIC No. 8.88 "is not overly vague for using the words 'so substantial' as a modifying phrase." (*People v. Hovarter, supra,* at p. 1028.) The instruction "is not flawed for providing that the jury should choose the penalty that is 'warranted' rather than 'appropriate.' " (*Ibid*.)

CALJIC No. 8.88 is not flawed for failing to assign to the People the burden of proving beyond a reasonable doubt the existence of an aggravating factor or that the aggravating factors outweigh the mitigating factors. (*People v. Manibusan* (2013) 58 Cal.4th 40, 100.) The high court's decisions in *Jones v.*

*United States* (1999) 526 U.S. 227, *Apprendi v. New Jersey* (2000) 530 U.S. 466, and *Ring v. Arizona* (2002) 536 U.S. 584, do not change this conclusion. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 149-150; *People v. Salcido* (2008) 44 Cal.4th 93, 167.) The instruction is not unconstitutional for failing to require juror unanimity on aggravating factors. (*People v. Moon* (2005) 37 Cal.4th 1, 43.) The United States Supreme Court's *Apprendi* line of decisions does not compel a different result. (*People v. Blair* (2005) 36 Cal.4th 686, 753.) The instruction is not unconstitutional for failing to inform the jury that the prosecution bears some burden of persuasion at the penalty phase. (*People v. Manibusan, supra,* at p. 100.) "[I]t is settled that 'the trial court need not and should not instruct the jury as to *any* burden of proof or persuasion at the penalty phase.' " (*People v. Butler* (2009) 46 Cal.4th 847, 874.) The trial court was not required to instruct the jury that the defendant bears no burden to prove mitigating factors or that it need not be unanimous in finding the existence of any mitigating factor. (*People v. Riggs* (2008) 44 Cal.4th 248, 328.) "[T]he jury need not be told that there is no burden of proof at the penalty phase" (*People v. Contreras* (2013) 58 Cal.4th 123, 172) and the lack of such an instruction is not structural error. (*People v. Moon, supra,* at p. 44.)

Defendant's assertion that CALJIC No. 8.88 improperly reduced the prosecution's burden of proof below that required by section 190.3 does not raise a claim distinct from those we reject above. (*People v. Suff, supra*, 58 Cal.4th at p. 1078; *People v. Moon, supra,* 37 Cal.4th at p. 43.)

"The absence of written or other specific findings by the jury regarding aggravating factors did not deprive defendant of his federal due process and Eighth Amendment rights to meaningful appellate review, violate equal protection of the laws or violate defendant's Sixth Amendment right to trial by jury." (*People v. DeHoyos, supra,* 57 Cal.4th at p. 150.)

51

"The trial court's failure to inform the jury that there is a presumption of life does not violate a defendant's constitutional rights to due process, to be free from cruel and unusual punishment, to a reliable determination of his sentence, and to equal protection of the law under the Fifth, Eighth and Fourteenth Amendments to the federal Constitution." (*People v. McKinnon* (2011) 52 Cal.4th 610, 698.)

### c. Failing to instruct the jury about the meaning of life without the possibility of parole

Defendant argues that neither CALJIC No. 8.88 nor any other instruction informed the jury that a sentence of life without the possibility of parole meant defendant would *never* be considered for parole. He maintains that the trial court had a duty to instruct on its own motion concerning "the true meaning of this sentence." "We repeatedly have held, however, that trial courts are not required — either upon request, or on the court's own motion — to instruct that a sentence of life without possibility of parole will inexorably be carried out, because such an instruction would be an incorrect statement of the law. [Citations.] We likewise have rejected the suggestion that *Simmons v. South Carolina* (1994) 512 U.S. 154, and its progeny mandate such an instruction. [Citations.]" (*People v. Whalen* (2013) 56 Cal.4th 1, 88.) We have held that CALJIC No. 8.84, which was given in this case, adequately informs the jury that a defendant sentenced to life without the possibility of parole is ineligible for parole. (*People v. Duenas* (2012) 55 Cal.4th 1, 28.) We are not persuaded to revisit these prior holdings.

### 4. Cumulative effect of guilt and penalty phase errors

Defendant contends that the cumulative effect of the guilt and penalty phase errors requires reversal of the judgment. We have concluded that defendant forfeited many of his claims of error. In any event, we have either rejected the merits of defendant's claims or found that any error, assumed solely for purposes

of argument, was harmless.  We now conclude there is no cumulative effect of error requiring reversal of the judgment.  (*People v. Panah* (2005) 35 Cal.4th 395, 479-480.)

### 5. *Constitutionality of California's capital sentencing statutes*

Contrary to the claim of defendant, " 'California does not employ the death penalty as a " 'regular punishment for substantial numbers of crimes' " [citation], and its imposition does not violate international norms of decency or the Eighth Amendment's prohibition against cruel and unusual punishment.' " (*People v. DeHoyos, supra,* 57 Cal.4th at p. 151.)  And " '[r]eview for intercase proportionality' is not required by the federal Constitution." (*Ibid.*)

### 6. *International Law*

Defendant contends imposition of the death penalty violates international law and asks us to reconsider our previous rejection of this claim.  We decline to do so and repeat that "California's death penalty law does not violate international law.  We reach this conclusion taking into consideration defendant's assertions that the International Covenant on Civil and Political Rights binds state courts and that international legal norms are among the evolving standards of decency used to define the scope of the Eighth Amendment to the federal Constitution.  [Citation.]" (*People v. Duenas, supra,* 55 Cal.4th at p. 28.)

### III. DISPOSITION

The judgment is affirmed in its entirety.

**CANTIL-SAKAUYE, C. J.**

**WE CONCUR:**

BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.
YEGAN, J.*

---

\* Associate Justice of the Court of Appeal, Second Appellate District, Division Six, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Adams

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S118045
**Date Filed:** October 30, 2014

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Lance A. Ito


_____

**Counsel:**

Ronald F. Turner, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Jaime L. Fuster and Colleen M. Tiedemann, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Ronald F. Turner
321 High School Rd. NE, Suite D3, PMB 124
Bainbridge Island, WA  98110
(916) 396-6412

Colleen M. Tiedemann
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 576-1334