Filed 8/20/15  P. v. Scott CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>PATRICK DEMARCO SCOTT,<br><br>Defendant and Appellant. | C076387<br><br>(Super. Ct. No. 11F07788) |

While in prison, defendant Patrick Demarco Scott was put on contraband surveillance watch after officers suspected a female visitor passed contraband to him through a kiss.  Defendant later defecated four bindles that contained cocaine and marijuana.  Defendant claimed the officers lied in their reports and filed a *Pitchess*[1] motion to discover exculpatory evidence in their personnel files.  An in camera hearing

---

[1]     *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

1

resulted in no discoverable documents.  At trial, a jury found defendant guilty of possessing cocaine and marijuana while confined in state prison.

Defendant makes two arguments on appeal.  First, defendant contends the prosecutor committed prejudicial misconduct during closing argument by:  (1) making statements to the jury he knew to be untrue; (2) vouching for key prosecution witnesses; (3) inserting himself personally into the case; and (4) denigrating the reasonable doubt standard.  Defendant further argues that he did not forfeit this issue by failing to object.  Alternatively, defendant argues his trial counsel was ineffective for failing to object.

Second, defendant requests that this court review the sealed transcript of the in camera hearing on his *Pitchess* motion "to determine whether personnel records of . . . [O]fficers Phillips and Mejia older than five years prior to May 29, 2011" were reviewed for *Brady*[2] material.  We reject the claims of prosecutorial misconduct but conditionally reverse and remand on the *Pitchess/Brady* issue.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 29, 2011, Officer Russell Snyder was assigned to monitor the video surveillance of the inmate visitation area at Folsom State Prison.  He became suspicious when he saw defendant's female visitor leave the restroom then sit back down with defendant.  The female moved an unidentified object within her mouth and kissed defendant.  Defendant then took a drink of his beverage and struggled to swallow.  Based on his training and experience, Officer Snyder believed the actions of defendant and his female visitor represented a common method for inmates to introduce contraband into a correctional facility.  Defendant was taken into additional custody and placed on contraband surveillance watch.

---

[2]     *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215].

Defendant remained under surveillance for five days. On June 3, 2011, Officers Matt Phillips, Scott Epsey, and Enoch Mejia removed defendant from his cell. Defendant appeared "wobbl[y]," so medical assistance was called. After defendant defecated, Officer Phillips searched defendant's bowel movement and found four bindles. Defendant was then taken to the medical clinic for further medical treatment. The contents of the bindles were later identified as marijuana with a net weight of 0.75 grams and cocaine with a net weight of 0.75 grams.

Defendant insisted the officers were lying about the discovery of the bindles and prior to trial filed a *Pitchess* motion to obtain discovery of Officer Phillips's and Officer Mejia's personnel files to corroborate his theory. The trial court found sufficient cause for review and held an in camera hearing but determined no discoverable documents existed in the officers' files.

At trial, the jury was shown the surveillance video of the alleged contraband exchange while Officer Snyder narrated. Moreover, Officers Phillips, Scott, and Mejia all testified that defendant had defecated the bindles. However, there were inconsistencies among the officers' testimony and reports as to the offense date and details of defendant's medical condition during the incident. Officer Phillips testified defendant appeared wobbly and received medical attention but did not include that in his initial report. After speaking with the prosecutor, he prepared a supplemental report on June 15, 2012, that included details of defendant's medical condition. Officer Mejia testified that medical staff responded and said defendant was faking, but Officer Mejia's report noted defendant had no medical issues and was returned to his cell without incident after defecating. His report stated the incident occurred on June 6, 2011, but the report was dated June 3, 2011. He initially testified he was unsure which date was correct. Finally, Officer Epsey testified consistent with his August 20, 2012, report which stated defendant appeared to lose consciousness on two occasions and required

3

medical attention, but both his report and testimony suggested the incident took place on May 29, 2011.

During closing argument, defense counsel argued the officers "fell far short of being believable," citing the "remarkably wrong" dates on their reports, inconsistent testimony, and evasive behavior on the stand. She argued "something [is] going on here. . . . [A]nytime an inmate has medical issues, that's relevant and needs to be included in a report" because "[reports] may later be needed to help an inmate or to help defend the prison in a liability suit." Defense counsel continued, "[the officers'] incompetence must not end in a lawsuit. It must end in a conviction, only then may it look like they weren't actually incompetent on so many fronts." Counsel further argued that Officer Phillips was "hoping" defendant would defecate the contraband because after five days of keeping him under surveillance with no results, "it is going to look really bad for them, if they don't end up charging him with wrongdoing."

During rebuttal closing argument the prosecutor asked the jury, "Is there any evidence of some *imaginary civil suit*? *Any?*" Later he continued, *"[defense counsel] kept talking in closing argument again and again about some kind of liability suit . . . . [¶] If there was evidence of some kind of liability suit . . . don't you think she would march somebody in here to tell you that? She presents [something] to justify . . . these guys are biased because they are getting sued."*[3] The prosecutor also announced that defendant was taking the position that the officers were *"all lying, they [were] all risking their jobs, they [were] all risking their retirements . . . ,"* and defendant called Officer Phillips *"a liar, and . . . a coconspirator, and he has committed crimes in front of you."* Finally, the prosecutor presented the two conflicting interpretations of the evidence in this case. "One, [the officers] are telling you the truth about something that happened

---

**3** Italics indicate the specific language defendant argues was prosecutorial misconduct.

between May 29 and June 3rd, 2011.  The videotape corroborates that you see it.  [¶] And, two, [the officers] are part of *some conspiracy, apparently started by Officer Snyder . . . I'm part of it too cause I talked to them.  I talked to my witnesses before they testified*."

Throughout rebuttal closing argument, the prosecutor also offered multiple descriptions of the reasonable doubt standard.  First he implored the jury, "Again and again you were asked, if you had to vote right now during jury selection, how would you vote?  Not guilty.  I haven't heard any evidence.  [Defendant] has the presumption.  I [have] the burden.  *It's this artificial abstract construct that kind of put*[*s*] *you in the mind frame to start to get you thinking that way, not guilty, not guilty, not guilty.*"  The prosecutor then commented, "[*defendant*] *said . . . you don't make decisions beyond a reasonable doubt in normal life."*  He argued "[w]hy is [defendant] saying that?  Because [*defendant*] *wants to make it an alien concept. . . .*  [¶]  *You use it all the time.*  The example that I g[a]ve you for circumstantial evidence.  Mom and Junior and the cookie jar. . . .  *You do it all the time*."  Finally, the prosecutor explained that "[t]he presumption of innocence protects every one of us, including this defendant . . . like . . . [a] kind of a force field or a *bubble . . . .*"

After deliberations, the jury found defendant guilty as charged.

DISCUSSION

I

*Prosecutorial Misconduct*

" ' " 'A prosecutor's conduct violates the Fourteenth Amendment . . . when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct . . . that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.'  [Citation.]  When a claim of misconduct is based on the prosecutor's comments before the jury . . . ' "the

5

question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " ' " (*People v. Adams* (2014) 60 Cal.4th 541, 568.)

" '[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion--and on the same ground--the defendant [tendered an objection] and requested that the jury be admonished.' " (*People v. Hill* (1998) 17 Cal.4th 800, 820.)  A failure to do so will be excused only if such action would be futile or not correct the harm.  (*People v. Adams*, *supra*, 60 Cal.4th at p. 569.)

To overcome forfeiture, a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and, as a result, the defendant suffered prejudice.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674, 693].)

Of the four claims of prosecutorial misconduct, defendant objected at trial only to the prosecutor's alleged false statements about a liability suit and thus the other claims are forfeited.  However, because defendant also asserts ineffective assistance of counsel for failure to object, to determine whether counsel was ineffective we must first determine if the prosecutor's actions constituted misconduct, warranting an objection. Thus, despite the forfeiture, we address each of defendant's claims to determine if misconduct occurred.

A

*Untrue Statements*

Defendant contends the prosecutor's statements about the lack of evidence of an "imaginary" liability suit were misconduct because the prosecutor knew the statements were untrue.

Defendant argues the prosecutor knew of a lawuit based on the following testimony given by Officer Philips during the preliminary examination:

"[Q.]  And you are aware that Mr. Scott is filing a lawsuit related to this incident?

6

"[A.]  Correct.

"[Q.]  And you've actually reviewed the paperwork from that incident -- I mean that he has filed?

"[A.]  I have not."

We agree that it is improper for the prosecutor to lead the jury to believe a fact the prosecutor knew to be untrue (*People v. Bittaker* (1989) 48 Cal.3d 1046, 1105), but we disagree the prosecutor did so here.  To the extent the prosecutor's argument was that no evidence was presented at trial of a civil suit, that argument is true.  Despite defense counsel's intimations during closing that the officers could be lying to protect themselves from a civil suit, no evidence of a civil suit was introduced at trial.  Alternatively, to the extent the prosecutor's argument could be understood to mean the suit was nonexistent or "imaginary," Officer Phillips' testimony does not disprove this.  The testimony is at best equivocal as to whether a suit had been filed.  Therefore, we find no misconduct.

B

*Vouching For Key Prosecution Witnesses And Introducing Facts Not In Evidence*

Defendant next contends the prosecutor vouched for key witnesses by characterizing defendant's theory as the officers were "all lying . . . risking their jobs . . . their retirement[s]" and Officer Phillips was "a liar, and . . . a coconspirator, and has committed crimes in front of you."

"It is misconduct . . . to suggest to the jury in arguing the veracity of a witness that the prosecutor has information undisclosed to the trier of fact bearing on the issue of credibility, veracity, or guilt." (*People v. Padilla* (1995) 11 Cal.4th 891, 946, overruled on other grounds in *People v. Hill*, *supra*, 17 Cal.4th at p. 823, fn. 1.)  In *Padilla*, defense counsel suggested that the prosecutor's ballistics expert had " 'made up' " his conclusions about the murder weapon during testimony.  The prosecutor then argued to the jury that if his ballistics expert had lied, he "would have 'risked his whole career of 17 years.' " (*Padilla*, at p. 946.)  The Supreme Court expressed "doubt that the argument

7

was proper" but found "no reasonable probability that defendant was prejudiced by the prosecutor's argument . . . ." (*Ibid.*) Similarly here, the defense argued that the officers "fell far short of being believable." In response, the prosecutor argued that if defendant was correct and the officers were lying, then they were "risking their jobs" and "risking their retirement[s]." While it may be common knowledge that lying under oath carries its own legal consequences, the prosecutor implied facts not in evidence regarding the consequences the officers would face in their employment if they lied. However, we, like the court in *Padilla*, find no " ' " ' "reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " ' " (*People v. Adams*, *supra*, 60 Cal.4th at p. 568; see *Padilla*, at p. 946.)

C

*Appealing To The Passions Of*

*The Jury And Personally Inserting Himself Into The Case*

Defendant contends the prosecutor appealed to the passions of the jury and personally inserted himself by saying, "I'm part of [the conspiracy] too cause I talked to them. I talked to my witnesses before they tesified."

Defendant argues first that the prosecutor, by his statement, "improperly engaged in inflammatory conduct that appealed to the passions of the jury." (*People v. Fuiava* (2012) 53 Cal.4th 622, 693; see *People v. Redd* (2010) 48 Cal.4th 691, 742.) In *Fuiava*, "the prosecutor improperly engaged in inflammatory conduct that appealed to the passions of the jury" "[b]y presenting th[e] witness to the jury in his bloodstained uniform and eliciting the deputy's emotional testimony . . . ." (*Fuiava,* at p. 693.) In *Redd*, comments such as "you people will not get it" and "if you cannot reach a decision on this, we are in sad shape" directed at the jury during closing argument "did not invite an irrational or emotional response" but rather focused the jury on its role, criticized theories of the defense, and emphasized the overwhelming strength of prosecution's case. (*Redd*, at pp. 743-744, italics omitted.) Here, defendant gives no explanation as to why

8

the prosecutor's statements amounted to inflammatory conduct or invited an irrational response from the jurors (other than citing the rules pulled from *Fuiava* and *Redd*), nor do we find that they did.

Next, defendant contends the prosecutor improperly injected himself personally into the case. Defendant argues that these circumstances are equivalent to those disapproved in *Fuiava*. (*People v. Fuiava*, *supra*, 53 Cal.4th at p. 693.) In *Fuiava*, the defendant shot and killed a deputy. (*Id.* at p. 634.) The defense offered evidence that the Vikings, a group of deputies within the sheriff's department, acted illegally and were considered to be a rival gang in the Lynwood area. (*Id.* at p. 643.) During closing arguments, the prosecutor stated " 'if I am worthy enough . . . I am going to become a Viking.' " (*Id.* at 693.) The prosecutor then affixed a triangle Viking pin to his jacket. (*Ibid.*) Our Supreme Court found this act of "literally 'becom[ing] a Viking' " to be improper vouching because "the prosecutor placed his own prestige and the prestige of his office behind the Vikings." (*Id.* at p. 694.)

The prosecutor should not have inserted himself into the argument by asserting that under one interpretation of the evidence (implicitly defendant's) he was part of the officers' conspiracy because he talked to them before they testified. Nonetheless, we do not find the statement made by the prosecutor in this case equivalent to the ceremonial act of solidarity and backing performed by the prosecutor in *Fuiava*. The act in *Fuiava* elevated the status of the Vikings above that of the prosecutor and implied that because other members of the Vikings, which included the prosecutor, would act honorably, the victim would have acted honorably too. (*People v. Fuiava*, *supra*, 53 Cal.4th at p. 694.) Here, the prosecutor's brief statement, although improper because he injected himself into the case, was not meant to elevate or vouch for the credibility of officers in the same way the prosecutor did in *Fuiava*, and we conclude there is no reasonable likelihood that the jury construed the statements in that manner.

9

# D

## *Denigration Of The Reasonable Doubt Standard*

Defendant contends the prosecutor misstated the reasonable doubt standard during rebuttal closing argument. Defendant first argues the prosecutor "softened" the presumption of innocence by describing it as an "artificial abstract construct" and likening it to a "bubble." He contends "artificial" is synonymous with "false" and "a bubble is both fragile and easily disappears." We disagree.

" '[I]n the context of the whole argument and the instructions' " we do not find there was a reasonable likelihood the jury understood the prosecutor's remarks to mean the presumption of innocence is artificial. (See *People v. Centeno* (2014) 60 Cal.4th 659, 667.) " '[W]e "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Ibid.*) Instead, we find the prosecutor's statement merely commented on how the jury had been exposed to the presumption of innocence standard from the outset. Also, we do not lightly infer that the jury understood the prosecutor to be characterizing the presumption of innocence as fragile and easily disappearing because he chose to use the word "bubble." In the same sentence, the prosecutor also referred to the presumption as a "force field" and in the preceding sentence he described it as "protect[ing] every one of us."

Defendant also argues the prosecutor improperly likened the reasonable doubt standard to one used in everyday life and further trivialized it by comparing it to the circumstantial evidence instruction involving Junior and a cookie jar.

We disapprove of the prosecutor's statement "[y]ou use it all the time" to suggest that people make decisions "all the time" in normal life using the beyond-a-reasonable-doubt standard. (See *People v. Nguyen* (1995) 40 Cal.App.4th 28, 36 [disapproving of, but ultimately finding no prejudice in, "arguments suggesting the reasonable doubt standard is used in daily life to decide such questions as whether to change lanes or marry . . . even when the prosecutor . . . also states the standard for reasonable doubt is 'very

10

high' and tells the jury to read the instructions"].)  "The judgment of a reasonable man in the ordinary affairs of life, however important, is influenced and controlled by the preponderance of evidence[,]" but something more is required in a criminal trial involving life and liberty.  (*People v. Brannon* (1873) 47 Cal. 96, 97.)

As to the defendant's claim of ineffective assistance of counsel, however, we find no prejudice.  Prior to closing arguments, the court properly instructed the jurors on the reasonable doubt standard and reminded them that they would have a complete copy of the jury instructions for reference.  "When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' "  (*People v. Osband* (1996) 13 Cal.4th 622, 717.)  Therefore, we find no prejudice from the prosecutor's argument.

## II

### *Pitchess/Brady*

On appeal defendant argues that "the trial court needed to conduct a review [beyond] the statutory five-year period [for *Pitchess* motions] to determine if *Brady* material existed in the [officers'] personnel records," and he requests we review the sealed transcript of the in camera hearing to determine if that review occurred.  The People concede that defendant's motion sought review of the personnel records under both *Pitchess* and *Brady* and that the trial court found sufficient cause for an in camera review, and they do not object to defendant's request for us to review the sealed records.  As we will explain, the required review did not occur.

## A

### *Additional Factual Background*

This case presents yet another example of the interplay of *Pitchess* and *Brady* continuing to create confusion for litigants, third parties, and the courts.  Here, the entire

11

incident took place at a California Department of Corrections and Rehabilitation (CDCR) facility under the supervision of CDCR correctional officers. Because the incident occurred exclusively at a CDCR facility, the district attorney sent a letter informing defendant that "Penal Code Section 832.7 restricts the access of all parties, including prosecutors, to peace officer records. If circumstances exist that lead the defense to believe that peace officer files may contain discoverable or exculpatory information, the defense may obtain access thereto by complying with the provisions of Evidence Code Sections 1043 through 1046."**4**

Defendant contends he was not present in the contraband watch area at the time of the alleged events and he did not defecate any illegal substances. He alleged Officer Philips and Officer Mejia were untruthful in their reports and framed him to cover up their mistakes.

As directed by the prosecutor, defendant filed a motion pursuant to Evidence Code section 1043, et seq., and *Pitchess*. Within his motion, defendant embedded a section titled "Motion for *Brady* Material," which requested discovery of all documents containing evidence that was favorable to him and material on the issue of either guilt or punishment within the meaning of *Brady*, regardless whether such documents related to

---

**4**     In *People v. Superior Court (Johnson)* (2015) 61 Cal.4th 696, the California Supreme Court recently held that "the prosecution does not have unfettered access to confidential personnel records of police officers who are potential witnesses in criminal cases. Rather, it must follow the same procedures that apply to criminal defendants, i.e., make a *Pitchess* motion, in order to seek information in those records." (*Id.* at p. 705.) The court further held that "[b]ecause a defendant may seek potential exculpatory information in those personnel records just as well as the prosecution, the prosecution fulfills its *Brady* obligation if it shares with the defendant any information it has regarding whether the personnel records contain *Brady* material, and then lets the defense decide for itself whether to file a *Pitchess* motion." (*Id.* at p. 716.) "[P]ermitting defendants to seek *Pitchess* discovery fully protects their due process right under *Brady*, *supra*, 373 U.S. 83, to obtain discovery of potentially exculpatory information located in confidential personnel records." (*Id.* at p. 721.)

12

matters within the five-year period described in Evidence Code section 1045, subdivision (b)(1).**5** Defendant also sought documents alleging acts by Officers Philips and Mejia involving "falsification of evidence or testimony" or "other alleged acts involving moral turpitude" that occurred within five years of his alleged offense.

In response, CDCR filed an opposition, arguing that a *Pitchess* motion is not the proper procedure to obtain *Brady* material and any disclosures must be limited to five years prior to the incident. The trial court found sufficient cause for defendant's *Pitchess* motion and conducted an in camera review. The trial court determined there was nothing responsive to the request in the personnel records and ordered the transcript of the in camera hearing sealed.

B

*Pitchess Procedure*

If there is impeachment information in the personnel files of the officers whose testimony makes up the entirety of the People's case, that information is *Brady* material and discoverable even if it is not necessarily subject to disclosure under the *Pitchess* scheme. (See *Abatti v. Superior Court* (2003) 112 Cal.App.4th 39, 59; *City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 7-10; *Giglio v. United States* (1972) 405 U.S. 150, 154 [31 L.Ed.2d 104, 108].) Here, the People do not dispute that defendant was entitled to *Brady* information potentially in the officers' personnel files, and they do not oppose defendant's request that we review the sealed transcript of the in camera hearing to determine whether review for *Brady* material occurred. Accordingly, we examine the transcript to determine whether *Brady* review occurred during the in camera

---

**5** Under Evidence Code section 1045, subdivision (b)(1), complaints in an officer's personnel file concerning conduct occurring more than five years before the offense that is subject to the litigation are be excluded from disclosure.

13

*Pitchess* hearing -- specifically, whether the trial court conducted a review that went back further than the statutory five-year period.  We conclude that no such review occurred.

Under *People v. Mooc* (2001) 26 Cal.4th 1216, on a finding of good cause for discovery, "the custodian of the records is obligated to bring to the trial court all 'potentially relevant' documents to permit the trial court to examine them for itself."  (*Id.* at pp. 1228-1229.)  The custodian must also be prepared to state for the record what other documents or category of documents not presented to the court were included in the complete personnel file and explain his or her decision to withhold them.  (*Id.* at 1229.)

Here, it appears the custodian did not review the officers' files for *Brady* material beyond the five-year period as there was no mention of *Brady* during the in camera hearing.  With respect to the review for *Pitchess* material, the court did not proceed as required.  During the hearing, the custodian was put under oath and examined by the court regarding her responsibilities as the litigation coordinator and how a *Pitchess* review is generally conducted.  The custodian brought the personnel files of Officers Phillips and Mejia to court.  She did not submit them for review but instead said they contained no relevant material or complaints.  The trial court asked the custodian to "briefly describe, without going into the specifics" what was in the personnel files.  The custodian explained that the contents of a correctional officer's file "depends on their employment and how long they have been employed, but it looks something this; and it is broken down into their benefits, their pay history, and then employee performance, employment history, and miscellaneous."  The custodian did not address the contents of either Officer Phillips's or Mejia's file individually, which she had on the table in front of her.  Satisfied with the custodian's representations, the court did not examine the files and ordered the transcript of the in camera hearing sealed.

Although only potentially relevant documents must be submitted for court review, the custodian is required to explain why she determined the documents not produced were irrelevant to the defendant's request.  (*People v. Mooc*, *supra*, 26 Cal.4th at

14

p. 1230.)  Here, we conclude the court's general inquiry into what types of documents were contained in an officer's personnel file and whether Officer Phillips's and Officer Mejia's files contained complaints, fell short of requiring the custodian to explain why she opted to withhold certain documents.  The trial court must inspect Officer Mejia's and Officer Phillips's files in court individually and access anything even potentially relevant.  "Absent this information, the court cannot adequately assess the completeness of the custodian's review of the personnel files," nor can the court determine whether the custodian reviewed the files for *Brady* material beyond the five-year time limit for *Pitchess* review.  (*People v. Guevara* (2007) 148 Cal.App.4th 62, 69.)  Accordingly, remand is required.

## DISPOSITION

The judgment is reversed and the case is remanded to the trial court with instructions to hold a new in camera hearing.  If after review on remand, the trial court determines there are no discoverable records, the judgment is to be reinstated as of that date.  If the trial court determines on remand that relevant information exists, "the trial court 'must order disclosure, allow [defendant] an opportunity to demonstrate prejudice, and order a new trial if there is a reasonable probability the outcome would have been different had the information been disclosed.' " (*People v. Gaines* (2009) 46 Cal.4th 172, 178.)

          ROBIE         , J.

We concur:


     NICHOLSON    , Acting P. J.


     DUARTE     , J.