Filed 9/23/20  P. v. Spurlock CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G055975 |
| v. | (Super. Ct. No. 14CF2383) |
| RONALD PRESTON SPURLOCK, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Michael A. Leversen, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Ferrentino & Associates and Correen Ferrentino, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Elizabeth M. Kuchar, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Ronald Preston Spurlock of two counts of human trafficking, four counts of pimping, eight counts of pandering, and one count of conspiracy to dissuade a witness. The court sentenced him to 20 years, eight months in state prison.

Defendant contends: (1) his trial counsel improperly conceded all of the charges of pimping and pandering during closing argument, (2) there was insufficient evidence to convict him of human trafficking, (3) CALCRIM No. 1243 misstates the elements of human trafficking, (4) there was insufficient evidence to convict him of four counts of pandering, (5) the court's modified jury instruction for pandering misstated the law, and (6) the court abused its discretion by denying his motion for new trial.

We reject these contentions, with the exception that we agree there was insufficient evidence to support the two convictions for pandering in counts 14 and 18. Nevertheless, there was sufficient evidence to support lesser included offenses of attempted pandering for these counts. So, we will modify the verdicts on counts 14 and 18 to convictions for attempted pandering and remand the matter for resentencing.

## FACTS

The prosecution used a police officer to introduce expert testimony on pimping and human trafficking. During his testimony, the officer described multiple terms and their meanings in pimping subculture. "The game" is a term people use to indicate they are involved "within the prostitution and pimping lifestyle." A "date" or "trick" is an act of prostitution between a "john" (sex purchaser) and a prostitute. An "in call" means a john is going to the location where the prostitute is. Pimps use the terms "home," "team," and "family" for the prostitutes who work for them. The escort section of backpage.com is commonly used by prostitutes to place ads to arrange dates.

Pimps commonly control every aspect of the prostitute's life: they determine how often they work, keep all of the money the prostitutes earn, and decide what prostitutes can spend it on. Pimps often start out charming and inviting to

2

encourage prostitutes to work for them, but then become abusive and violent to control them.

The following evidence was introduced regarding specific alleged victims.

*A. B.N.*

B.N. met defendant in 2012 while she was working as an exotic dancer. She started dating defendant shortly after they met. She admitted to posting multiple backpage.com ads under the name "Brooke Banks," but denied working as a prostitute.

Another woman, A.G., worked as a prostitute for defendant during 2014. A.G. said B.N. was defendant's "number one girl" and taught her about the game. B.N. booked backpage.com ads for A.G. and went with her on dates. B.N. and A.G. booked a "double date" with a john who turned out to be an undercover police officer.

A different woman who worked for defendant saw him drop B.N. off for multiple dates. She also saw B.N. give all of the money she earned from these dates to defendant.

At one point during their relationship, B.N. wrote defendant a letter which said she was "tired of being isolated," "tired of only being able to go home when you give me permission to do so," and "tired of the bruises and the scars."

The prosecution introduced two weeks of text messages between B.N. and defendant. Defendant continually checked in with B.N., asking where she was, how much money she made, and what she was doing. At one point, he reminded her she had to make "a band" ($1,000) or "get the hand."

*B. R.A.*

R.A. met defendant while she was a dancer at a strip club called the Library. She began dating defendant, and he immediately began telling her to work more at the Library. He also tried to convince her to become a prostitute by posting ads on backpage.com, but she said she declined.

Defendant forced her to work all the time and "got violent with [her]" multiple times, including punching her, throwing her on the ground, and kicking her. Defendant made her work at the Library and in Las Vegas and took all of the money she earned. He paid for her rent, bills, food, and clothes.

She tried multiple times to leave defendant, but "he wouldn't let [her] go." He once broke into her house and waited for her in the living room, and sometimes waited outside her house throughout the night. He constantly called or text her and told her he put a tracking device on her car.

R.A. denied ever working as a prostitute for defendant and said all the money she earned was from dancing. However, text messages between R.A. and defendant referred to her turning "tricks." At one point, R.A. sent defendant a text she was "done with all this stripper/trick shit."

## C. L.C.

L.C. worked at the Library and was friends with R.A. Defendant text L.C. "that [she] should mess with a real one and make money with him." She understood this to mean defendant wanted her to be a prostitute and for him to be her pimp.

## D. T.B.

T.B. met defendant at a nightclub. He repeatedly tried to get her to work for him as a prostitute. She declined each offer and defendant eventually grabbed her backside and said "I could make you five grand in a week if you mess with me." She said no, defendant pushed her, and she knocked over some drinks on his table. She walked away and a glass or heavy plastic cup hit her in the head.

## E. Paris

Paris[1] was a prostitute in Phoenix. Defendant saw her ads on backpage.com and told B.N. and D.J., another woman working for defendant as a

---

[1] Paris did not testify during the trial. All of the information about her was introduced through text messages and backpage.com ads.

4

prostitute, to call one of the ads and recruit Paris. While working in Phoenix, D.J. saw Paris and got her phone number. Defendant began texting Paris. The expert opined the texts were consistent with a pimp trying to recruit a prostitute to work for him. At the end of the conversation, Paris agreed to "come home" to defendant.

## DISCUSSION

*1. Concessions During Closing Argument*

Defendant argues his counsel improperly conceded his guilt in violation of his constitutional trial rights during closing argument. We do not agree.

*A. Background*

During a hearing on the motions in limine with defendant present, defense counsel said "I'm going to make a statement in opening statements that there was prostitution going on and [defendant] acted as a pimp with those girls and that there was money being made. [¶] That's not going to be in dispute. This whole case is going to be about the human trafficking . . . . "[2]

At the beginning of his closing argument, defense counsel said "I walked in here at the beginning and I admitted to you, 'this guy is a pimp.'" He then explained defendant's case was about understanding the difference between a pimp and a human trafficker.

Defense counsel discussed the importance of the presumption of innocence, saying: "Well, that presumption still stands really. Unless and until you go into that jury room and all 12 of you agree on each and every count, [defendant] remains not guilty until you do that."

While summarizing the evidence, defense counsel said "[defendant] did some things that are wrong. I'm not disputing he violated the law. He's not a human trafficker." Remarking on defendant's relationship with some of the witnesses defense

---

[2] The record on appeal does not contain the opening statements.

5

counsel said defendant's behavior, "may make him a pimp. It may make him guilty of pandering[.]"

Defense counsel repeatedly asked the jury to find defendant not guilty of human trafficking. He emphasized that multiple women said they voluntarily worked for defendant, and concluded his discussion of the evidence saying, "I'll tell you right now [defendant]'s a pimp," but to find him not guilty of human trafficking.

*B. Analysis*

Defendant relies on *McCoy v. Louisiana* (2018) __ U.S. ___ [138 S.Ct. 1500] (*McCoy*) and (*People v. Farwell* (2018) 5 Cal.5th 295, 300 (*Farwell* )) to argue his counsel's concessions were effectively a guilty plea without a waiver of his constitutional rights. We do not agree because both cases are distinguishable from the case at hand.

In *McCoy*, defense counsel decided the best approach to avoiding a death sentence for the defendant was to concede his guilt to the alleged murders. However, the defendant explicitly objected to the strategy before the trial began. Defense counsel pursued the strategy over the defendant's objection and during his opening statement said, "there was 'no way reasonably possible' that [the jury] could hear the prosecution's evidence and reach 'any other conclusion than [defendant] was the cause of these individuals' death.' [Citation.]" (*McCoy, supra*, [138 S.Ct at p. 1506].) The defendant immediately objected and told the court his attorney was "'selling [him] out' . . . ." (*Ibid.*) Defendant testified and maintained his innocence to the charges. During closing argument defense counsel again said the defendant committed the murders and counsel "'took [the] burden'" of proof off the prosecution as to guilt. (*Id*. at p. 1507.)

In ruling defense counsel's actions violated defendant's Sixth Amendment rights, the United States Supreme Court explained a defendant does not surrender all control of his defense when deciding to receive the assistance of counsel. (*McCoy, supra*, [138 S.Ct at p. 1508].) Specifically, the "[a]utonomy to decide that the objective of the defense is to assert innocence" belongs to the defendant. (*Ibid.*) Therefore,

6

"[w]hen a client *expressly asserts* that the objective of 'his defense' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." (*Id*. at p. 1509, italics added.)

In the instant case, defendant was present when his counsel said he was going to concede the pimping and pandering charges, and he neither disagreed with his counsel's tactics nor testified in contradiction with the concessions. Therefore, *McCoy* is inapt.

In *Farwell*, the defendant was charged with a DUI and driving on a suspended license. Before closing arguments, defense counsel joined in a stipulation conceding all of the elements of driving on a suspended license. (*Farwell, supra*, 5 Cal.5th at pp. 288-299.) Further, the jury was instructed they had to accept the stipulated facts as true, and the court neither advised the defendant of his rights implicated by the stipulation, nor solicited a waiver of those rights. (*Id*. at p. 299.) The jury convicted the defendant of driving on a suspended license.

Our Supreme Court overturned the conviction for driving on a suspended license after determining the stipulation "effectively surrendered [the defendant's] privilege against self-incrimination, his right to confrontation, and his right to a jury trial" without a proper waiver. (*Farwell, supra*, 5 Cal.5th at p. 300.) The court reasoned the stipulation was the equivalent of a guilty plea because it established every element of the crime and "completely relieved the prosecution of its burden of proof" by instructing the jury the stipulation must be followed. (*Ibid*.)

This case is different. Here, defense counsel did not stipulate to facts that were equivalent to a guilty plea. While defense counsel referred to defendant as a pimp, he also told the jury defendant remained not guilty "on each and every count" until they unanimously found him guilty. More importantly, unlike in *Farwell*, the jury was not instructed they had to accept any of defense counsel's comments about the evidence as true. Therefore, the concessions did not "limit the scope of the jury's role" or reduce the

burden on the prosecution to prove each element of each count. (*People v. Lopez* (2019) 31 Cal.App.5th 55, 64 [defense counsel's concession of hit and run during closing argument did not constitute a guilty plea].) Thus, defense counsel's actions were not the equivalent of a guilty plea as in *Farwell*.

In short, the concessions did not violate defendant's constitutional rights.

## 2. *Sufficiency of the Evidence for Human Trafficking*

Defendant argues there was insufficient evidence to convict him of human trafficking against B.N. and R.A in violation of Penal Code section 236.1, subdivision (b) (§ 236.1(b)).[3] We disagree.

"In reviewing a challenge to the sufficiency of evidence, the reviewing court must determine from the entire record whether a reasonable trier of fact could have found that the prosecution sustained its burden of proof beyond a reasonable doubt. In making this determination, the reviewing court must consider the evidence in a light most favorable to the judgment and presume the existence of every fact the trier could reasonably deduce from the evidence in support of the judgment. The test is whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable doubt." (*People v. Mincey* (1992) 2 Cal.4th 408, 432.)

As charged in this case, defendant is guilty of human trafficking under section 236.1(b) if he deprived or violated the victim's personal liberty for the purpose of intending to commit or maintain the crime of pimping.

"'Deprivation or violation of the personal liberty of another' includes substantial and sustained restriction of another's liberty accomplished through force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person, under circumstances where the person receiving or

---

[3] All further statutory references are to the Penal Code unless otherwise noted.

8

apprehending the threat reasonably believes that it is likely that the person making the threat would carry it out." (§ 236.1, subd. (h)(3).)

A person is guilty of pimping if they know someone to be a prostitute and are supported by that person's earnings from prostitution. (§ 266h; CALCRIM No. 1150.)

Defendant concedes the evidence "indicates [B.N.] voluntarily worked as a prostitute" for him, but argues there is no evidence he deprived her liberty or forced her to do so. Not so.

While B.N. testified to being a willing participant in her relationship with defendant, all of the other evidence is to the contrary. R.A. testified she saw defendant take all of the money B.N. earned after prostitution "in-calls." Two witnesses said they saw defendant yell at B.N., call her names, and humiliate her in front of other people. In a text message to B.N., defendant reminded her she had to earn $1,000 or receive a beating.

More importantly B.N.'s own words in her letter to defendant showed the control he had over her. She said she was "tired of being isolated," "tired of only being able to go home when you give me permission to do so," and "tired of the bruises and the scars." This, coupled with the expert testimony describing how pimps and human traffickers control the lives of their victims to keep them in the game, was more than sufficient to support the conclusion defendant deprived and violated B.N.'s liberty in order to get her to work as a prostitute.

Defendant argues the evidence only established R.A. worked as a stripper and thus the jury could not conclude he violated her liberty in order to commit pimping.[4]

---

[4] Defendant also argues the instruction for human trafficking is missing an essential element and there was insufficient evidence regarding this missing element for the human trafficking charge related to R.A. As we discussed *post*, the instruction is not missing any elements.

This argument is largely based on R.A.'s testimony that defendant tried to convince her to become a prostitute, but she refused. We are not persuaded.

Sufficient evidence supports the jury's decision that defendant violated R.A.'s liberty in order to force her to work as a prostitute. Again, he kept all the money she made, forced her to work as much as possible, and repeatedly terrorized and abused her. Plus, despite her insistence she was only dancing, she exchanged multiple texts with defendant referring to her turning "tricks." As explained by the expert, "trick" refers to an act of prostitution. And R.A.'s own texts to defendant distinguished between stripping and tricks by saying she is "done with all this stripper/trick shit." This alone is sufficient.

*3. Instructional Error for Human Trafficking*

Defendant argues CALCRIM No. 1243 misstates the law of human trafficking because it does not require the alleged victim to complete a commercial sex act.[5] Not so.

"In considering a claim of instructional error [reviewing courts] must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys." (*People v. Andrade* (2000) 85 Cal.App.4th 579, 585.) We apply the de novo standard of review in determining whether a jury instruction correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

The court instructed the jury using CALCRIM No. 1243, which described the elements of human trafficking as follows: "1. The defendant either deprived another person of personal liberty or violated that other person's personal liberty; [¶] AND [¶] 2. When the defendant acted, he intended to commit or maintain a violation of . . . [s]ection 266h (Pimping)."

---

[5] The Attorney General argues defendant forfeited this issue by not objecting to the instruction during trial. However, "no objection is required to preserve a claim for appellate review that the jury instructions omitted an essential element of the charge." (*People v. Mill* (2012) 53 Cal.4th 400, 409.)

The CALCRIM No. 1243 given mirrors the language of section 236.1(b), and neither the section nor the instruction requires defendant to induce the victim to complete a commercial sex act in order to be guilty of human trafficking. Even so, defendant argues the Legislature intended to include this additional requirement via section 236.1, subdivision (g) (236.1(g)). We reject this argument.

Section 236.1(g) states "[t]he Legislature finds that the definition of human trafficking in this section is equivalent to the federal definition of a severe form of trafficking found in Section 7102(9) of Title 22 of the United States Code." United States Code section 7102(11)[6] defines "severe forms of trafficking in persons" as in relevant part: "(A) sex trafficking in which a commercial sex act is induced by force, fraud, or coercion . . . ."

In determining the meaning of a statute, we look first to the plain language for "[w]hen the statutory language is clear and unambiguous, there is no need for construction and courts should not indulge in it. [Citation.] The plain language of the statute establishes what was intended by the Legislature." (*People v. Fuhrman* (1997) 16 Cal.4th 930, 937.) Additionally, we must consider the language of section 236.1 as a whole. (*Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 ["various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole"].)

The plain language of section 236.1(b) does not require a defendant to have induced another person to complete a commercial sex act to be guilty of human trafficking. Instead, it establishes a person needs to deprive or violate the personal liberty of the victim with the intent to get them to commit a commercial sex act. There is clearly no requirement the victim has to complete a commercial sex act. Further, nothing in the language of section 236.1(g) indicates it changed the elements of 236.1(b).

---

[6] Section 7102 was renumbered on January 9, 2019 and the definition of "severe forms of trafficking in persons" was changed from section 7102(9) to section 7102(11).

Considering the language of section 236.1 as a whole, we note section 236.1, subdivision (c) defines human trafficking of a minor and specifically criminalizes: "A person who causes, . . . or attempts to cause, . . . a person who is a minor . . . to engage in a commercial sex act . . . ." Thus, the Legislature knows how to write completion of a commercial sex act into an offense but did not do so in section 236.1(b).

In sum, the plain language of section 236.1(b) does not require the completion of a commercial sex act, and we will not read that requirement into the statute. CALCRIM No. 1243 does not misstate the law of human trafficking.

*4. Instructional Error For Pandering*

Defendant argues the court erred by instructing the jury with an edited form of CALCRIM No. 1151, which removed the word "successfully" from the first element of pandering.[7] Once more, we disagree.

The edited version of CALCRIM No. 1151 given to the jury explained the essential elements of pandering for procurement under section 266i, subdivision (a)(1) (section 266i(a)(1)).[8] First, section 266i(a)(1) does not include the word "successfully," but merely states a person is guilty of pandering if they "[p]rocure[] another person for the purpose of prostitution." More importantly, both the words "persuade" and "procure" connote success. "Procure" means "to take care of, bring about, obtain," "to cause to happen to be done," or "to get possession of (women) and make available for

---

[7] The court instructed the jury using an edited form of CALCRIM No. 1151 provided by the prosecution, which said, in relevant part: "To prove the defendant is guilty of pandering, the People must prove that: [¶] 1. The defendant persuaded or procured [the alleged victims] to become a prostitute. [¶] AND [¶] 2. The defendant intended to influence [the alleged victims] to be a prostitute. The unedited version of CALCRIM No. 1151 states, in element one, "The defendant **successfully** (**persuaded/procured**) . . . ."

[8] Section 266i(a)(1) states any person who "[p]rocures another person for the purpose of prostitution" is guilty of pandering.

12

promiscuous sexual intercourse." (Webster's 3d New Internat. Dict. (1981) p. 1809, col. 2.) Persuade means "to induce by argument . . . into some mental position," "win over by appeal to one's reason and feelings," or "argue into an opinion or procedure." (*Id.* at p. 1687, col. 3.) Therefore, the word "successfully" was redundant to the language in the instruction and there was not a reasonable likelihood the jury was confused.[9]

In sum, the court did not err in instructing the jury with the edited version of CALCRIM No. 1151.

*5. Sufficiency of the Evidence for Pandering*

Defendant contends there was insufficient evidence to convict him of pandering under section 266i(a)(1) against R.A., L.C., T.B., and Paris. We disagree regarding R.A. and Paris, but agree as to T.B. (count 14) and L.C. (count 18).

Defendant argues there was insufficient evidence to convict him of pandering R.A. because "[n]othing in record suggests she ever agreed to work as a prostitute" for him. Not so. As discussed *ante*, there was sufficient evidence to support a contrary conclusion.

Regarding Paris, defendant asserts there was insufficient evidence she ever intended to enter into an agreement to work for defendant. We disagree.

Paris's text messages with defendant were consistent with a prostitute agreeing to work for a new pimp: she discussed her concerns about working for someone new, asked defendant what he did when girls were on "dates," and expressed a desire to earn the kind of money defendant was promising. Near the end of the conversation defendant asked if she was "coming home 2 us 4 sure" and she said yes. Thus, there was evidence Paris agreed to work as a prostitute for defendant.

---

[9] Defendant contests the jury could have been confused regarding the elements of pandering because the prosecutor argued defendant did not need to be successful in convincing the women to be prostitutes. However, any claims regarding whether the prosecutor misstated the law are forfeited because there was not a timely objection. (*People v. Adams* (2014) 60 Cal.4th 541, 568-569.)

Defendant also argues there was no evidence to conclude T.B. or L.C. ever agreed to act as a prostitute for him.  The Attorney General concedes these points, and we accept these concessions.

However, the Attorney General notes the charging language in the information only alleged pandering under section 266i(a) without specifying subdivision (a)(1).  From this, they argue we should uphold the conviction because there was sufficient evidence to support a conviction under section 266i, subdivision (a)(2).[10]  We reject this argument.  As discussed *ante*, the jury was specifically instructed as to section 266i(a)(1), and we will not find they convicted defendant for a different crime.

However, there was sufficient evidence to support a conviction for attempted pandering.  Attempted pandering is a lesser included offense of pandering for procurement when the defendant solicits a person to become a prostitute, but they refuse the proposal.  (*People v. Charles* (1963) 218 Cal.App.2d 812, 819; *People v. Grubb* (1914) 24 Cal.App. 604, 608.)  In this case, there was substantial evidence defendant attempted to procure L.C. and T.B. to work for him as prostitutes, but they refused.

Under section 1161, subdivision 6 and section 1260 "an appellate court that finds that insufficient evidence supports the conviction for a greater offense may, in lieu of granting a new trial, modify the judgment of conviction to reflect a conviction for a lesser included offense."  (*People v. Navarro* (2007) 40 Cal.4th 668, 671.)  Therefore, we modify the verdicts as to counts 14 and 18 to reflect convictions for attempted pandering under sections 664, subdivision (a) and section 266i(a)(1).

---

[10]  Under section 266i, subdivision (a)(2) a defendant can be convicted of pandering by using "promises, threats, violence, or by any device or scheme, [that] causes, induces, persuades, or encourages another person to become a prostitute."

*6. Denial of Motion for New Trial*

Defendant contends the court abused its discretion by denying his motion for new trial because: (1) the modified version of CALCRIM No. 1151 used to instruct the jury as to the law of pandering was erroneous, (2) his counsel was ineffective for failing to object to the modified version of CALCRIM No. 1151 and for conceding the pimping and pandering charges. We cannot agree.

We review the denial of a motion for new trial for an abuse of discretion. (*People v. Earp* (1999) 20 Cal.4th 826, 890.) As we have discussed *ante*, the omission of "successfully" from CALCRIM No. 1151 did not result in instructional error. Therefore, it was not an abuse of discretion to deny defendant's motion on this ground.

In order to establish ineffective assistance of counsel, a defendant must prove his counsel's performance was deficient, and that his defense was prejudiced as a result of this deficiency. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) As noted, defense counsel's failure to object to the modified instruction was not deficient.

In reviewing defense counsel's concessions, we "must in hindsight give great deference to counsel's tactical decisions." (*People v. Holt* (1997) 15 Cal.4th 619, 703.) Further, "[r]ecognizing the importance of maintaining credibility before the jury, we have repeatedly rejected claims that counsel was ineffective in conceding various degrees of guilt." (*People v. Freeman* (1994) 8 Cal.4th 450, 498.) Given the evidence in this case, counsel's tactical decision to concede the pimping and pandering charges in order to maintain credibility to argue the human trafficking charge was not deficient.

15

**DISPOSITION**

As to counts 14 and 18, the judgments are ordered modified to reflect convictions for attempted pandering under sections 664, subdivision (a) and 266i, subdivision (a)(1).  The matter is remanded for resentencing.  In all other respects, the judgment is affirmed.


THOMPSON, J.

WE CONCUR:


FYBEL, ACTING P. J.


IKOLA, J.